Lanny Paul VENABLE *v.* STATE of Arkansas

CR 75-207                                        538 S.W. 2d 286

Opinion delivered July 12, 1976

202

*Don Langston* and *Hubert Graves*, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *B. J. McCoy*, Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant was charged and found guilty of the murder of Donnie Edward Douglas on December 21, 1974, while engaged in the perpetration of the crime of rape of Sherry Douglas in violation of Ark. Stat. Ann. § 41-4702 (A) (Supp. 1973). He was sentenced to life imprisonment without parole. He seeks reversal of the judgment of conviction on 15 grounds. We find no basis for reversal of this judgment on any of them or on any objection made during the course of the trial. We shall review the points for reversal argued by appellant in the order raised by him and state the facts disclosed by the evidence only to the extent necessary for proper treatment of them.

I

THE COURT ERRED IN REFUSING TO SET BAIL.

Appellant moved that the court set bail pending trial. He admits in argument here that it would have been difficult for him to have made bail in any amount and that his motion was actually an attack upon the constitutionality of our capital felony murder statute's provision for the death penal-

ty. He argues that the death penalty is cruel and unusual punishment contrary to Art. 2 § 9 of the Arkansas Constitution and Amendment Eight to the United States Constitution. We have held the death penalty provision of the act constitutional on similar attacks. *Collins* v. *State,* 259 Ark. 8, 531 S.W. 2d 13; *Neal* v. *State,* 259 Ark. 27, 531 S.W. 2d 17. See also, *Graham* v. *State,* 253 Ark. 462, 486 S.W. 2d 678. Appellant somehow reads the diverse opinions of individual justices of the United States Supreme Court to collectively mandate abolition of the death penalty, at least as embodied in the Arkansas statutes. We do not so read these opinions. See *Collins* v. *State,* supra. It seems to us that this is foreclosed by the decisions of the United States Supreme Court in *Gregg* v. *Georgia,* 428 U.S. 153, 96 S. Ct. 2971, 49 L. Ed. 2d 859 (1976); *Proffitt* v. *Florida,* 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Jurek* v. *Texas,* 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 944 (1976). See Criminal Law Reporter, Vol. 19, No. 13. Be that as it may, any challenge by appellant to the death penalty is moot, because he was sentenced to life imprisonment without parole. *Harris* v. *State,* 259 Ark. 187, 532 S.W. 2d 423.

## II

THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION THAT JURORS WHO WOULD NOT CONSIDER THE DEATH PENALTY NOT BE EXCUSED FOR CAUSE IN THAT PART OF THE TRIAL AT WHICH DEFENDANT'S GUILT OR INNOCENCE WOULD BE DECIDED.

## III

THE COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR A ONE WEEK CONTINUANCE IN ORDER TO PRESENT EVIDENCE THAT A JURY COMPOSED ONLY OF PERSONS WHO WOULD CONSIDER THE DEATH PENALTY IS MORE LIKELY TO CONVICT THAN IS A JURY COMPOSED OF A CROSS SECTION.

## IV

## THE COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR PAYMENT OF TRAVEL EXPENSES AND WITNESS FEES TO EXPERT WITNESSES WHO WOULD TESTIFY THAT A JURY COMPOSED ONLY OF PERSONS WHO WOULD BE WILLING TO CONSIDER THE DEATH PENALTY IS MORE LIKELY TO CONVICT THAN IS A JURY COMPOSED OF A CROSS SECTION.

This case was set for trial in March, 1975, but continued until April 28, 1975, in order to permit appellant's attorney to prepare for trial. On April 24, 1975, appellant moved in limine that prospective jurors who are opposed to, and who would under no circumstances vote for, the death penalty not be excused for cause in that portion of the trial at which the defendant's guilt or innocence was to be determined on the ground that a jury composed of only persons who would consider the death penalty would be more likely to convict him than would a jury composed of a cross-section which included persons who would refuse to consider the death penalty and that trial before a jury composed of persons who would be willing to impose the death penalty would deny him a fair trial and otherwise violate rights guaranteed him by the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and the due process clause of Art. 2 § 8 of the Arkansas Constitution. By oral amendment, appellant also invoked the constitutional guaranties of right to trial by an impartial jury in the Sixth Amendment to the United States Constitution and Art. 2, § 10 of the state constitution. Motion was denied. In passing, it appears to us that failure to excuse jurors who would be unwilling to consider the death penalty under any circumstances could, in effect, nullify our death penalty statute, because it requires that the same jury which determines guilt also determine the sentence to be imposed in the sentencing stage of a bifurcated trial. See Ark. Stat. Ann. § 41-4710 (Supp. 1973). Be that as it may, we find no error in the circuit judge's action on this motion. Basically, the constitutional law on the subject of excusal of jurors for cause because of their unwillingness to consider the death penalty under any circumstances is stated in *Withers-*

*poon* v. *Illinois,* 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968) and *Bumper* v. *North Carolina,* 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968), decided the same day. The very argument advanced by appellant was rejected in *Witherspoon,* in the light of information then available to the court. In *Bumper,* the court also rejected the argument that a jury so selected deprived a defendant of his Sixth Amendment right to trial by an impartial jury. We find no violation of constitutional rights in denial of this motion.

In effect, appellant recognizes the impact of the holding in *Witherspoon* on his contention, but says that he was prepared to make the showing which was lacking in *Witherspoon.* On April 24, 1975, at 12:43 p.m., appellant filed his motion for a continuance from April 28 to May 5 to enable him to obtain the attendance of Dr. Daniel Taub, a psychologist of Springfield, Missouri, who he alleged was employed at the Medical Center for Federal Prisoners there. On the same date, appellant filed a motion asking that the court order the Treasurer of Sebastian County to pay the $500 witness fee of Dr. Taub, along with his travel expenses, alleging that this doctor had indicated in a telephone conversation with appellant's attorney that, in the doctor's professional opinion, a jury composed entirely of persons who would be willing to impose the death penalty would be more likely to convict a defendant than would a jury which included some who would not consider the death penalty. It was further alleged that appellant's attorney had attempted, without success, to obtain the testimony of expert witnesses locally and had been informed that no local experts had any experience in the area.

Appellant also moved on April 25, 1975 that the case be continued to May 5, 1975, in order that he might obtain the attendance of Dr. Faye Goldberg, a psychologist, employed by the University of Chicago in Chicago, Illinois, who had indicated in a telephone conversation with appellant's attorney that she held the same professional opinion as that attributed to Dr. Taub and that her opinion would be supported by testimony in accordance with an article written by the witness, a copy of which was attached to the motion. The article was entitled, "Toward Expansion of Witherspoon, Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law" and reprinted from the Har-

vard Civil Liberties Law Review, Vol. V, No. 1, January, 1970, pp. 53-69.

All the motions regarding these points for reversal were heard by the circuit court on April 28.

The granting or denial of a motion for continuance to obtain the attendance of an absent witness lies within the sound judicial discretion of the trial judge, and his action will not be reversed on appeal in the absence of such a clear abuse of that discretion as to amount to a denial of justice. *Figeroa v. State,* 244 Ark. 457, 425 S.W. 2d 516; *Thacker v. State,* 253 Ark. 864, 489 S.W. 2d 500; *Freeman v. State,* 258 Ark. 496, 527 S.W. 2d 623. The denial of a motion which is not in substantial compliance with statutory requirements is not an abuse of discretion.

One of the critical factors in the consideration of such a motion is the diligence of the party seeking the continuance in obtaining the testimony or the attendance of the witness. Ark. Stat. Ann. §§ 27-1403 (Repl. 1964), 43-1706 (Repl. 1964); *Thacker v. State,* supra. In denying the motion, the circuit judge pointed out that appellant's attorneys, the Public Defenders, were appointed on January 2, 1975, that the case was continued for one month to permit them to prepare for the trial, that he had specifically inquired of the Public Defender's office five or six days before the trial date about any possible motions for continuance and was not informed of any, and that the inquiry was made partially because the judge had been advised that the prosecuting witness was coming from California for the trial and some 20 or 25 witnesses, many of whom did not reside in Arkansas, had been subpoenaed for the April 28 date. Even though appellant's attorney advised the court that he had exhausted all possibilities of locating witnesses in Arkansas who were qualified to testify on the subject and did not learn of the identity or availability of the witnesses sought until after the court's inquiry, we cannot say that the court's implicit finding that there was a lack of due diligence in obtaining the attendance of either witness to support appellant's motion in limine was erroneous.

In order to obtain a continuance because of the absence of a witness, it is necessary that the movant support his motion by affidavit stating what facts affiant believes the witness will prove and not merely the effect of such facts in evidence. In the case of an expert witness, this would at least require that the basis of his opinion be stated. The requirement was not even substantially complied with in the case of Dr. Taub. Assuming however, for the purpose of his motion that attaching the article written in 1970 by Dr. Goldberg was a sufficient statement of facts to which the witness would testify, it is not verified by anyone's affidavit, as required by statute. Nor does anyone, by affidavit, express the belief that the facts stated are true. Furthermore, the materiality of the factual background for the testimony of the expert witness does not appear on the face of the motion, because her opinion seems to be based on 1966 data. The failure to file the required affidavit is another significant factor in appellate review of the trial court's action in denying a motion for continuance. *Thacker* v. *State*, supra; *Brown* v. *State*, 252 Ark. 846, 481 S.W. 2d 366.

If all the other requirements for a continuance had been met, the testimony of Dr. Goldberg could not well be the basis for appellant's position. Appellant argues that the United States Supreme Court, in *Witherspoon*, invited the same kind of evidence Dr. Goldberg could have furnished. Appellant points out that in rejecting the precise argument he advances, the United States Supreme Court said that the data adduced by the petitioner there was too tentative and fragmentary to establish the premise and that the court could not conclude on the basis of the record before it, or as a matter of judicial notice, that exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or innocence and substantially increases the risk of conviction. It seems evident to us from footnotes in both the *Witherspoon* and *Bumper* opinions that the very article which appellant relies upon as indicative of Dr. Goldberg's probable testimony was among the fragmentary scientific data rejected by the *Witherspoon* court as insufficient.

Appellant has failed to show that there was an abuse of the trial court's discretion in denying his motion for continuance to permit him to make a showing of at least

questionable relevance on the matter of jury selection. We perceive no significant difference, insofar as the trial court's discretion is concerned, between this case and *Blanton* v. *State*, 249 Ark. 181, 458 S.W. 2d 373, cert. den. 401 U.S. 1003 (1970), where we held that there was no abuse of discretion in the denial of a motion for continuance to permit a defendant to investigate the nature and makeup of a jury panel to determine its economic class composition.

V

THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO ASK A PROSPECTIVE JUROR IF HE WOULD IMPOSE THE DEATH SENTENCE.

We find no error. Appellant argues that the asking of the following question of a prospective juror by the prosecuting attorney was error: "I believe your answer was that you would consider the death penalty, but then when it came right down to it if the circumstances justified it, would you impose it?" Appellant objected on the basis that the proper test was whether the juror would consider the death penalty. Appellant argues that the question was improper because it asked the juror to state whether he would vote for the death penalty in a specified hypothetical situation. We could well agree with appellant if the question had included a statement of a certain hypothetical situation or set of facts and tended to commit the juror to vote for the death penalty if that factual showing were made. This was not the case here. As a matter of fact, the prosecuting attorney, in pursuing the line of questioning, stated that no one knew what the evidence would be without hearing it, and that it was difficult for one to say what he might do. The juror's eventual affirmative answer was that he would go along with the death penalty if the circumstances justified it. We think the argument here is a semantical one which merits no consideration.

VI

THE TRIAL COURT ERRED IN REFUSING TO STRIKE FOR CAUSE A PROSPECTIVE JUROR WHO STATED THAT, GIVEN A CHOICE

OF VOTING CONVICTION OF CAPITAL
FELONY MURDER OR ACQUITTAL, HE COULD
NOT VOTE FOR ACQUITTAL, IF THE
EVIDENCE PROVED MURDER BUT DID NOT
PROVE CAPITAL FELONY.

We do not read the record on this point as appellant
does. The prospective juror had never served as a juror
before. It is clear to us that he did not fully understand
questions by appellant's attorneys about the requirement
that the state prove both murder and its commission in the
perpetration of rape and felt that proof of murder alone
would be sufficient for a conviction and for application of the
capital felony murder statute. On the basis of these answers,
appellant challenged the juror for cause. The prosecuting at-
torney then took up voir dire examination. Here again, the
juror was not able to distinguish between murder and capital
felony murder in his answers. He did state, however, that he
would follow the court's instructions. In response to further
questioning by appellant's attorneys, the juror answered that
he could not vote to acquit the defendant if the state failed to
prove perpetration of a rape beyond a reasonable doubt but
proved beyond a reasonable doubt that he committed
murder. Appellant again challenged the juror for cause. The
trial judge then explained that there were different degrees of
murder, that only capital felony murder could carry a death
penalty, and that the court might or might not give instruc-
tions on first degree murder along with a capital felony
murder instruction. The judge then asked if the case were
submitted only on the capital felony murder charge and the
state failed to prove the rape beyond a reasonable doubt,
whether the juror would still vote to find the defendant guilty
of capital felony murder. The juror responded, "Not
necessarily, no." The court then asked whether the juror
could listen to the evidence and return his verdict on that
evidence and the instructions given, even if the juror did not
agree with the instructions, and received an affirmative
answer. Thereafter, the court denied the challenge.

VII

THE COURT ERRED IN REFUSING TO
STRIKE FOR CAUSE A PROSPECTIVE JUROR

WHO STATED HE HAD AN OPINION WHICH IT WOULD TAKE PROOF TO REMOVE.

Here again, we evaluate the record differently. The juror did equivocally say that he had an opinion based upon newspaper and television accounts of the crime. When asked if he had an opinion, he answered, "Well, yes and no. It just — I'd have to hear the evidence, you know, of the case. I don't have a set opinion on it, really, either way." Upon pursuit of the point by appellant's attorney, the juror stated that he would "follow what the witnesses and the court decide" and that it would not require any proof other than what he heard in court to remove "what [I] now understand about the case," but that it would take some proof in court. Upon challenge for cause, the circuit court interrogated the prospective juror thus:

> THE COURT: Did I understand you to say — If I misquote you, please tell me — that you would follow the law and the evidence and the instructions?
>
> A. Yes.
>
> ******
>
> THE COURT: Would you take into consideration anything else?
>
> A. No, sir.
>
> THE COURT: Would you take into consideration your opinion, regardless of how lightly held or strongly held it is at this time?
>
> A. (Nods head no).

We find no abuse of the trial court's discretion in denying the challenge for cause.

## VIII

THE COURT ERRED IN OVERRULING DEFENDANT'S OBJECTION AND ALLOWING A

## WITNESS TO TESTIFY TO TELEPHONE CONVERSATIONS WHICH OCCURRED OUTSIDE THE PRESENCE OF THE DEFENDANT.

The witness was Modine Sosebee, a friend and neighbor of Donnie Douglas and Sherry Douglas, the victim of the murder and the alleged victim of the rape respectively. The friendship was close. The two couples went to the same church, as did Mr. and Mrs. Edward Douglas, Donnie's father and mother, and the parties visited occasionally on the telephone. The Douglases owned a hog and had planned to butcher it at the Sosebee residence, one-half mile across the field from the Donnie Douglas house, on Saturday, December 21, with the help of the Sosebees. Mrs. Sosebee testified that she received a telephone call about 6:00 a.m. on that day, from Sherry, who said that they would be unable to butcher the hog because Donnie had gone to Alabama with Roger Pierce (Donnie's stepbrother) to pick up Angie's (Roger's sister's) car. Mrs. Sosebee said that on the next day, Sunday, Bertha Douglas, Donnie's stepmother, called on the telephone. An objection to this witness' relating the statements of Bertha (Mrs. Edward) Douglas was sustained. The objection was on the grounds of hearsay and the right to confrontation. The objection on the right to confrontation was overruled, since it was disclosed by the state's attorney that Bertha Douglas would be a witness. The state's attorney also stated that the telephone conversation was not offered to show the truth of the statements but to show that the conversation took place. The court then overruled the objection. The witness then said that Mrs. Douglas asked if the kids (Donnie and Sherry) were there, and said there had been a death in the family and that members of the family had been trying to reach Donnie and Sherry the day before without success. Mrs. Sosebee said that she then reported the substance of her conversation with Sherry on Saturday morning, and that Mrs. Douglas replied that Donnie and Roger did not go to Alabama and then said, "Something has happened. We're going to go look for those kids. Roger got back yesterday morning and Donnie wasn't with him." The court then admonished the jury that this conversation was not offered for the purpose of showing its truth but merely to show that it had taken place.

Appellant only argues the hearsay objection here. In considering this objection, it is necessary that we consider some of the background that had already been developed. Sherry Douglas had testified about the plans to butcher the hog and that Donnie's parents knew of the plans. She had also testified that Donnie and Roger had planned to go to Alabama to pick up an automobile, but that Pierce had actually left without Donnie on Friday. She said that appellant had killed her husband and raped her during the night, and directed her to call Mrs. Sosebee and tell her that Donnie had changed his mind about killing the hog on Saturday but she had told appellant that she should say that Donnie had gone to Alabama with Roger and would kill the hog when he got back. The reason she made this suggestion was because she knew Donnie had seen Mrs. Sosebee on Friday evening and thought he might have told her that Roger had gone to Alabama without him and that Mrs. Sosebee might know that something was wrong and knew that Mrs. Douglas would know and that someone would come over to see what was wrong.

Mrs. Bertha Douglas later testified that on Saturday she had received a telephone call concerning the whereabouts of Donnie and Sherry Douglas and had called Mrs. Sosebee, who told her of the telephone call from Sherry. Mrs. Douglas said that, since she knew that Roger had gone to Alabama alone and had returned with the car on Sunday morning, her husband then went to Donnie's home, but he soon returned, and, as soon as she could get someone to babysit with a granddaughter, both of them went to the residence of Donnie and Sherry. It was then about 5:00 p.m. She said Donnie's car was gone but that a Chevrolet car was sitting there. After attending to hogs, chickens, ducks and dogs on the place, Mr. Douglas went to the front door, and later both went to the back door, where they found a hole chopped in the door that had not been there when Mr. Douglas came over in the morning. She would not permit her husband to break in. According to her, they then went to church and delivered some Christmas gifts, but she continued to worry about Donnie and Sherry and called a deputy sheriff, who with another officer went to the Donnie Douglas house along with the elder Douglases. There they found Donnie's car parked at the house, his body on the floor, and appellant asleep on a bed to

which Sherry, who was nude, was tied.

Since Mrs. Douglas did testify, the right of confrontation was preserved. No objection was made to the testimony of Mrs. Douglas when she related the telephone conversation with Mrs. Sosebee. In view of this failure to object, the admonition given by the trial court, the relevancy of the telephone conversation to the actions of the elder Douglases leading to the discovery of their son's body and the insignificant bearing the statements of Mrs. Douglas had on the issues in the case, the error, if any, in admitting this evidence was harmless.

## IX

### THE COURT ERRED IN OVERRULING DEFENDANT'S OBJECTION AND ALLOWING THE PROSECUTOR TO ASK LEADING QUESTIONS ON DIRECT EXAMINATION.

These objections were directed at the examination of Richard Lanier, a service station operator who had seen appellant and Sherry Douglas at his station on Saturday, December 21, on two occasions. We have reviewed the record as abstracted and are unable to say that the trial judge abused his discretion.

## X

### THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR MISTRIAL AFTER THE STEPMOTHER OF THE DECEASED BROKE DOWN ON THE WITNESS STAND AND ASKED WHY ANYONE WOULD WANT TO KILL THE DECEASED.

## XV

### THE COURT ERRED IN REFUSING TO DECLARE A MISTRIAL WHEN THE WIFE OF THE DECEASED, AND ALLEGED VICTIM OF RAPE, RAN FROM THE COURTROOM CRYING DURING THE PROSECUTOR'S SUMMATION.

These points relate to emotional reactions of a witness on the one hand and a victim on the other. At the conclusion of her direct examination, Mrs. Douglas identified appellant as the person brought out of her stepson's house when she and her husband went there with the officers by pointing him out. Immediately the prosecuting attorney asked that the record show that she had identified appellant and Mrs. Douglas, crying, exclaimed:

> Oh, my God! Why, Lord, why Donnie, why Donnie, why? Why would anybody want to kill him (crying).

Appellant's prompt motion for a mistrial was denied but his subsequent alternative motion for an admonition to the jury was granted by the following statement:

> Any remarks that the witness made voluntarily that were not in response to questions are not considered evidence and will be disregarded by the jury.

The record is not so clear as to the actions of Sherry Douglas. Appellant's attorney stated, in moving for a mistrial before making his closing argument, that Sherry Douglas, who had been sitting near the jury box, had run from the courtroom crying during the prosecuting attorney's opening argument and that he could hear her sobbing, crying and talking outside the courtroom after her exit and was sure that the jury had. The prosecuting attorney was sworn and testified that he was within three or four feet of the jury when the incident was supposed to have occurred and that he did not hear Sherry Douglas crying or saying anything, although he was aware that someone had left the courtroom. Appellant testified that he saw Sherry Douglas get up and leave the courtroom crying and heard her crying until someone closed the door behind her. Thereafter, he said, he heard her sobbing. This motion was overruled. The trial judge was not asked to admonish the jury.

Emotional outbursts by the relatives of murder victims and by victims of crimes are not unusual and are difficult to control. In these instances there were no accusatory remarks or remarks directed at the accused. The trial judge must have been aware of all that took place in his presence and was in a

better position to evaluate the impact of these occurrences than anyone else. He had a wide latitude of discretion in the control of the trial. Utilization of the extreme and drastic remedy of declaration of a mistrial should be a last resort. We find no abuse of discretion in the denial of motions for a mistrial.

## XI

## THE COURT ERRED IN REFUSING TO DIRECT A VERDICT OF ACQUITTAL AS TO CAPITAL FELONY MURDER.

Appellant here contends that the evidence is insufficient to present a jury question as to his guilt of capital felony murder saying that, even when viewed in the light most favorable to the state, it did not show that the killing was committed by a person (appellant) engaged in the perpetration of rape. He tacitly concedes that the evidence on behalf of the state, if believed, is sufficient to show that he killed Donnie Douglas and that he raped Sherry Douglas, even though he steadfastly denies having done either b it he argues that the evidence does not show that the killing was done in order to accomplish the rape.

Of course, the necessary evidence may be circumstantial. The circumstances shown were sufficient basis for a reasonable mind to conclude, without resort to speculation or conjecture, that the killing was done while appellant was engaged in the perpetration of the crime of rape. A review of the evidence in the light most favorable to the state shows could come and drink a beer. They took Venable to his mother and stepfather about a city block away from the Douglas residence. He was a frequent visitor to the Douglas home after he had come to trade cars with Donnie and had met Sherry some two or three weeks prior to the slaying of Donnie. Lanny Venable, the Sosebees and the elder Douglases knew of the plan to butcher the Douglas hog at the Sosebee residence on Saturday, December 21. All of them knew about the plans of Donnie Douglas and Roger Pierce to go after an automobile in Alabama. On Friday night Lanny Venable went with Donnie and Sherry Douglas to the Grand Avenue Lounge where Donnie played in a band. While there,

Venable sat at the table with Sherry. He drank 10 or 12 cans of beer and she drank Sprite. The lounge closed at about 12:30 a.m. on Saturday and the three went to one or more places in search of drugs, without success. Sherry Douglas said that her husband was trying to get them for Venable. She testified that, on the way home, Venable asked if he might not come to the Douglas house and drink a beer. She said she told him she was tired and wanted to go to bed and that Donnie had said that he was tired, too, but that Venable could come and drink a beer. They took Venable to his mother's house so he could let her know where he was going. The Douglases left Venable there and went to their own house. Sherry said that she went to bed immediately. Venable testified that he got his rifle while at home, then got in his car and proceeded to the Douglas house. His excuse for getting the rifle was that there had been a problem about wolves or wild dogs. After Venable arrived, Donnie Douglas was playing tapes on his stereo tape player. The door between the bedroom and the living room was open. Sherry Douglas said that she could hear the two talking about a pizza Venable had brought but heard no argument between them. She heard Donnie talking about butchering the hog and then heard him walk across the room toward the stereo and change tapes. According to her, as soon as she heard the tape plugged up, she heard a shot and a thump, turned over and found Venable standing by her bed pointing a gun at her. She had glanced at the clock and noted that it was 2:10 a.m. She said that Venable told her that if she didn't do just as he said, he would kill her, too, and that prison had made him like he was. He added that if she were not pregnant, he would kill her right then, too. She said that when she tried to get off the bed and go to her husband, he shoved her back on the bed, hung a blanket over the door, made her lie down and started talking to her. She testified that when she asked him why he killed her husband, Venable said he had to in order to get him out of the way, that he had to talk to her, he was sorry, it was something he had to do and shortly thereafter he made her remove her clothing, engage in oral sex with him and then raped her. She said that Venable's rifle was right beside the bed and that she was afraid to resist him. After the intercourse, she said he tied her hands and feet to the bed with a cord he cut from the television set in the house and went to sleep for about 10 minutes. She said that later in the morning

she called Modine Sosebee at Venable's direction while he was holding a gun on her. She explained that she worded the conversation about killing the hog as she did because she thought Mrs. Sosebee would know something was wrong and would investigate. She said that Venable raped her again during the morning and then took her to his mother's house while no one was at home, made her cook breakfast for him, raped her again and then took her into Oklahoma, returning to the Douglas home on Sunday at about 1:00 p.m. when he poked the hole in the door, but locked it from the outside with a padlock. She stated that he again forced her to have intercourse with him but suggested that they leave and come back after dark, so it would not be so risky for him to leave. According to her, he said he would tie her to the bed, so that it would take several hours for her to get loose and enable him to escape before she called the police. She said they did return, he raped her again, tied her up and went soundly to sleep, not having slept but 10 minutes since he killed her husband. She said that while she was tied to the bed, she had seen car lights outside, then saw a car back out. It was after the car had left that Venable fell asleep. Shortly thereafter Donnie's parents and the officers came and rescued her.

Venable testified that Sherry killed Donnie when he plugged in the tape, using Venable's rifle. He admits the frequent acts of intercourse, except for the oral sex, but said that there was no force or compulsion involved. He explained that he tied Sherry to the bed as part of a prearranged plan for him to get away and for her to say that someone had broken into the house, shot her husband and raped her.

All the circumstances certainly afforded a reasonable basis for finding that Venable killed Donnie Douglas to enable him to perpetrate the crime of rape on Douglas's wife. It would be difficult to assign any other motive for the killing, if Venable was the killer.

## XII

### THE COURT ERRED IN REFUSING TO SUBMIT NO HIGHER AN OFFENSE THAN SECOND DEGREE MURDER TO THE JURY.

Appellant moved for a directed verdict as to first degree murder and moved that no issue be submitted on any greater offense than second degree murder. There was no prejudicial error as there was sufficient evidence to support the conviction of capital felony murder.

## XIII

### THE COURT ERRED IN ALLOWING THE STATE TOXICOLOGIST WHO STATED THAT HE WAS NOT A PHARMACOLOGIST OR AN EXPERT TO TESTIFY TO INFORMATION HE HAD AS TO HOW LONG CERTAIN DRUGS WILL REMAIN IN THE BLOODSTREAM.

The State Toxicologist was subpoenaed and presented as a witness by appellant. The witness testified that he had analyzed samples of blood taken from the body of Donnie Douglas. He found methamphetamines, Qualude, also known as Methoqualone, phenobarbitol and a blood alcohol content of 0.07 percent by "weight volume" of alcohol. He did not do a quantitative analysis to determine the amount of drugs present. On cross-examination, he said that since he was not a pharmacologist he could not say now long the drugs could have been in the bloodstream when the test was made, except in relation to information he had gained in order that he might carry on his job as an analyst. When asked what that information was, appellant's attorney's objection was overruled on the basis that the question was proper cross-examination. The witness then stated that, in cases in which he had performed analyses, there were those in which, to the best of his knowledge, the phenobarbitol had been taken as long as 20 days before the tests were made.

The relevance of the witness' testimony is not readily apparent. Someone shot and killed Donnie Douglas as he changed a tape on his stereo tape player. No one suggests that he had done anything at the time to provoke or invite an assault or that his death was caused by anything other than the gunshot wound. If the testimony related to mitigating circumstances, it is sufficient to say that the jury imposed the lesser punishment for capital felony murder. Assuming, however, that the evidence was admissible as a part of the res

gestae, in view of the fact that the questions were propounded on cross-examination, and, in view of the discretion invested in the trial judge to control cross-examination and to determine the qualification of a witness to give opinion evidence, we find no abuse of discretion.

## XIV

### THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT THE STATE MUST PROVE THE ELEMENTS OF A MURDER IN ORDER FOR THE DEFENDANT TO BE CONVICTED OF A CAPITAL FELONY.

Appellant argues that the court should have instructed the jury that they must find the elements of first degree murder, or at least all the elements of second degree murder before they could find appellant guilty of capital felony murder. Of course, in our view of the evidence, it sustains a conviction of capital felony murder, but appellant's complaint here goes to the matter of instructions to the jury. Appellant relies upon commentary on the equivalent section of the new Arkansas Criminal Code, Ark. Stat. Ann. § 41-1501, effective January 1, 1976. Since this provision was not in effect at the time of the offense charged or the time of trial, we forego any abstract discussion of its construction. It is sufficient for the purposes of this case to say that we view the capital felony murder statute in existence at the time of this offense in the same light that we have heretofore viewed the felony murder statute. In that light, proof of a homicide in the commission of rape relieves the state of the burden of proving premeditation, deliberation or the specific intent to take human life. See *Bosnick v. State,* 248 Ark. 846, 454 S.W. 2d 311; *Murray v. State,* 249 Ark. 887, 462 S.W. 2d 438; *Walker v. State,* 239 Ark. 172, 388 S.W. 2d 13.

We have, as in other cases involving the death penalty, reviewed the record for other objections made during the course of the trial and find none worthy of consideration.

The judgment is affirmed.