Timothy DAVIS *v.* STATE of Arkansas

CR 05-849 232 S.W.3d 476

Supreme Court of Arkansas
Opinion delivered March 16, 2006

*Richard L. Hughes,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Laura Shue,* Ass't Att'y Gen., for appellee.

BETTY C. DICKEY, Justice. Appellant, Timothy Davis, was convicted by a jury of capital murder and Class Y felony kidnapping. The circuit court sentenced him to life imprisonment on the capital murder, a concurrent fifteen years' imprisonment on the

kidnapping, and five years' imprisonment on a firearm enhancement to be served consecutively to the kidnapping sentence. Appellant raises the following points on appeal: (1) the evidence at trial was not sufficient to support the conviction for capital murder or for kidnapping; (2) the trial court erred by denying appellant's objection to the prosecutor's *voir dire* of the jury panel in a manner that fact-qualified the jury to reach a conclusion that appellant's acts were premeditated and deliberate; (3) the court erroneously sustained the State's objection to cross-examination of a State's witness that was aimed at impeaching his credibility and drawing an inference that he and others were armed; (4) the trial court abused its discretion by denying appellant's motion for mistrial after the mother of the victim cried out in the presence of the jury upon viewing a postmortem photograph of her son; and, (5) the trial court erred by not instructing the jury on lesser-included offenses to the kidnapping charge that were appropriate in light of the evidence at trial. We find no error and affirm. Because Davis was sentenced to life, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (2005).

On June 10, 2004, Davis got a ride from his longtime family friend, Alundra Smith, to the Woodbridge Apartments in order to buy drugs. Smith's friend, Beverly Young, was also a passenger in the car. Smith testified that she and Young stayed in the car while appellant got out, was gone for awhile, came back to the car, and then left again. Young, however, did not remember Davis returning to the car. Smith testified that, after waiting on Davis, she pulled down in the parking lot to see what was taking him so long, and saw him arguing with someone.

Kelly McCaster, cousin of Andrew Jackson, the victim, was standing outside the apartments with four other individuals, including Jackson, when he saw Davis get out of the car in which he was riding, a white Crown Victoria. Appellant asked McCaster and the others where Apartment 51 was, and then asked to use McCaster's phone. After Davis used the phone, he began walking back toward the car and McCaster heard someone say, "Hey, AD [Andrew Jackson], that look like Tim-Tim [Davis]."[1] McCaster testified that Jackson initiated a conversation with Davis, but Davis first went to the car, and was putting a pistol into his pocket as he

---

[1] Kelly McCaster, as well as the victim's girlfriend, Aquilla Phillips, testified that "AD" was a nickname for Andrew Jackson, the victim. Several witnesses testified that appellant, Timothy Davis, was known as 'Tim-Tim.'

came back. Aquilla Phillips, girlfriend of the victim, testified that she also saw Davis go back to the car before returning to have a conversation with Andrew Jackson. Phillips did not notice anything different about appellant when he returned from the car until Davis got "all jumpy" while having a conversation with Jackson. Phillips then noticed the gun handle hanging out of Davis's pocket. Davis and Jackson were talking about appellant's having allegedly robbed a friend of Jackson's the prior week. Phillips testified that Davis was really mouthing, but Jackson was only standing there rolling up a blunt (a marijuana cigar). Another eyewitness, Tirrell Daugherty, testified that it did not seem to be a hostile conversation. Phillips attempted to get Jackson to come inside and testified that he had turned to follow her just before she heard the gunshots. Davis shot several times, striking Jackson with three of the bullets, two in the back of the head and another in the side of the chest. Davis was the only individual seen with a gun that night, and no weapon was found on Jackson or anyone else at the scene. Jackson died six days later as a result of these injuries.

After the shooting, McCaster saw Davis jump into the backseat of the white Crown Victoria, and saw the car drive away. Smith testified that she had been sitting in her car with Young, talking to Tirrell Daugherty when she heard shots and began to look over to see what had happened. By that time Davis had jumped into the backseat of her car, gun in hand, and told her to "go, go, go." Smith heard Davis say, "I killed that mother fucker. I killed that nigger. These niggers going to stop playing with me." Young recalled Davis saying, "That ho ass nigger dead." Smith testified that she kept driving because Davis was hitting the back of her seat with his gun. Smith said that she was going to stop when the police began to chase her, but Davis would not let her. He was hitting her seat with his gun saying, "Girl, don't stop this car, do not stop this car." Young testified that Davis was actually pointing the gun to Smith's head when he told her not to stop, and that she advised Smith to keep going because she didn't know if Davis's gun was still loaded. As the car was driving over the bridge on I-30, Davis leaned over to the front seat and threw the gun out the window. After Davis got rid of the gun, Smith was able to stop the vehicle, at which time Davis attempted to run. The officers drew their weapons on Smith and Young, caught up with Davis, and took him into custody.

## I. *Sufficiency of the Evidence*

Davis first argues that because there was not sufficient evidence to support the charges, the trial court erred in refusing to grant a directed verdict as to capital murder and kidnapping. He contends that a directed verdict was proper for the capital murder charge because the State failed to prove that he acted with a premeditated and deliberate purpose in the murder. He also claims that a directed verdict was proper for the kidnapping charge because the State did not prove that Alundra Smith was restrained without her consent.

A motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Parker v. State,* 355 Ark. 639, 144 S.W.3d 270 (2004). When a defendant makes a challenge to the sufficiency of the evidence, the appellate court will view the evidence in the light most favorable to the State. *Baughman v. State,* 353 Ark. 1, 110 S.W.3d 740 (2003). The question to be answered on review is whether the verdict is supported by substantial evidence, direct or circumstantial, that is forceful enough to compel a conclusion that is beyond suspicion or conjecture. *Id.* Only the evidence that supports the verdict will be considered, and the verdict will be upheld if there is substantial evidence to support it. *Id.*

### Capital Murder

A person commits capital murder if "[w]ith the premeditated and deliberated purpose of causing the death of another person, he or she causes the death of any person." Ark.Code Ann. § 5-10-101(a)(4). Davis urges that the State failed to show that he acted with a premeditated and deliberate purpose, thus a directed verdict in his favor was proper. He points out that he was not aware, and never indicated to Alundra Smith or Beverly Young, that he would see Jackson at the Woodbridge Apartments. In addition, he emphasizes that it was Jackson who initiated the conversation that took place before Davis began shooting, and that he did not go to the apartments with the intention of harming Jackson.

Premeditation may be formed in an instant, and it usually must be inferred from the circumstances of the crime. *Sanders v. State,* 340 Ark. 163, 8 S.W.3d 520 (2000). Premeditation and deliberation may be inferred from the type and character of the weapon, the manner in which the weapon was used, the nature,

extent, and location of the wounds, and the accused's conduct. *Id.* Contrary to Davis's assertion, there is sufficient evidence of his premeditation and deliberation. First, most of the eyewitness testimony revealed that Davis walked back to the car before he began speaking to Jackson. Only afterwards did witnesses notice that he had a gun in his pocket, and one witness testified that Davis placed the gun in his pocket as he was returning from the car. It took longer than an instant for Davis to go to his car to retrieve his weapon, talk with Jackson, reach for his gun, aim at Jackson, and shoot. Even if he had been carrying the gun the entire time, there was enough evidence for the jury to conclude that he had made a premeditated and deliberate choice to shoot and kill Jackson when he pulled his gun from his pocket and shot the victim in vital areas, including his head and chest. Also, the words spoken by Davis when he jumped into Smith's car were not the words of a man who thought he had just made a mistake. The testimony was that Davis said, "I killed that mother fucker. I killed that nigger. These niggers going to stop playing with me" and "that ho ass nigger dead." Finally, the fact that Davis attempted to flee from arrest was a factor the jury could consider when determining his guilt. *Jones v. State,* 314 Ark. 289, 862 S.W.2d 242 (1993). Based on the evidence, it would be unreasonable for this court to assume that Davis did not intend to kill the victim. Because there was sufficient evidence of premeditation and deliberation, we affirm the trial court's denial of the motion for a directed verdict on the capital murder charge.

*Kidnapping*

Davis also contends that the trial court should have granted a directed verdict on this charge because the State failed to prove that Alundra Smith was restrained without her consent. However, the State argues that Davis' motion to the trial court did not preserve this particular issue for appeal, as his motion to the court alleged only that he was entitled to a directed verdict since Alundra Smith was released safely after the gun was thrown out the window.

Arkansas Rule of Criminal Procedure 33.1 provides, in pertinent part: "(c) . . . A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. . . ." Ark. R. Crim. P. 33.1 (2005). We have held that Rule 33.1 is to be strictly

construed, and the reason underlying the requirement for specific grounds is to give the State the opportunity to reopen its case to supply the missing proof, if justice so requires. *Pratt v. State*, 359 Ark. 16, 194 S.W.3d 183 (2004).

In the instant case, Davis did not argue to the trial court the specific element he now raises on appeal, that Alundra Smith was not proven to be restrained without her consent. Because the motion was not specific as to the element he now argues, the kidnapping claim is not preserved for appeal.

## II. Voir Dire

Davis contends that the State was attempting to *voir dire* in such a manner as to empanel a jury that would agree prospectively that the actions of Davis were premeditated and deliberate. The State responds by arguing that the trial court did not abuse its discretion in overruling appellant's objection, and that appellant should be precluded from relief on appeal that he had not requested from the trial court. Finally, the State argues that any possible prejudice became moot when appellant sought a justification defense (self defense).

The extent and scope of *voir dire* is left to the sound discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of discretion. *Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005). Abuse of discretion occurs when the circuit judge acts arbitrarily or groundlessly. *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004).

The only relevant objection made during *voir dire* regarding Davis's allegation that the State was attempting to "fact-qualify" the jury was the following:

> DEFENSE COUNSEL: Your honor, I object to this line of questioning. I think that the prosecutor is attempting to fact qualify this jury. The allegations against my client require a certain *mens rea* specific *mens rea* crimes. We have alleged that he was justified in that and that we intend to offer — well, the law is a bit confusing with regard to justification in a capital case, and it may imply manslaughter as an option here. We expect the facts to prompt the court to give that jury instruction.
>
> What he is doing presently is determining who can — or educating this jury on those two *mens rea* frame of

> minds, and I would suggest to the court that this is inappropriate in that for one he is not here doing closing arguments and secondly, he is trying to fact qualify these jurors. He might as well ask them if they would convict this guy on the two crimes with which he is charged.

Appellant did not seek particular relief, such as an admonition to the jury, when the prosecutor educated the jury on different forms of intent. In addition, both parties agreed that the jury panel was satisfactory at the conclusion of *voir dire*. The trial court was lenient towards both parties by allowing the prosecution to touch on intent, and allowing the defense to educate the jury on justification. Based upon these circumstances, we therefore hold that the trial court did not abuse its discretion, and we affirm on this point. *See Price v. State*, 365 Ark. 25, 223 S.W.3d 817 (2006).[2]

### III. Impeachment

During the direct examination of Kelly McCaster, the cousin of the victim and an eyewitness for the State, the prosecutor asked, "Did you ever see [the victim] with a gun," and, "Did any of you guys have a gun?" McCaster responded no to both questions. Davis argues that on cross-examination, the trial court should have allowed defense counsel to continue the line of questioning regarding the witnesses' past experiences with weapons. Davis contends that the questioning should have been allowed, first, because the defense was trying to prove, by impeachment, that Davis was not the only one with a gun at the scene of the crime, and second, because not allowing the questioning violated the appellant's constitutional right to confront his accusers.

---

[2] In *Price*, we held that the circuit court did not abuse its discretion in overruling an objection by the defense after the prosecutor made a comment during *voir dire* about what was expected of the jury when they are evaluating witnesses, and attempted to educate the jury on Arkansas law regarding intoxication. In coming to that conclusion, this court noted that the circuit court gave both the prosecution and the defense the opportunity to "educate the jury," that the appellant did not seek particular relief, and that both parties agreed that the jury panel was satisfactory at the conclusion of *voir dire*. While the trial judge in the instant case did not specifically say that he would allow both sides to educate the jury on intent, there was no attempt made by defense counsel to clear up any alleged confusion, etc. Nothing in the record suggests that the judge would not have allowed defense counsel to further educate the jury. As noted, defense counsel was allowed to discuss justification with the jury.

 This court has held that trial courts are afforded wide discretion in evidentiary rulings. *Anderson v. State*, 354 Ark. 102, 118 S.W.3d 574 (2003). We will not reverse a trial court's ruling on the admission of evidence absent an abuse of discretion, and, likewise, we will not reverse absent a showing of prejudice. *Id.* However, we do not consider either of appellant's arguments on this point on appeal, as he did not raise them to the trial court. We have repeatedly held that we will not address arguments, even constitutional arguments, raised for the first time on appeal. *Dowty v. State*, 363 Ark. 1, 210 S.W.3d 850 (2005). The following colloquy took place:

> DEFENSE COUNSEL: Are you very familiar with weapons?
>
> WITNESS: Somewhat.
>
> DEFENSE COUNSEL: And how is that, sir?
>
> PROSECUTOR: Your Honor, can we approach the bench, please?
>
> THE COURT: Yes.
>
> (Conference at the bench, out of the hearing of the jury as follows:)
>
> PROSECUTOR: I'm going to object to this line of questioning if this is going to go into if he has prior bad acts, plus he has a Fifth Amendment right here.
>
> DEFENSE COUNSEL: I'm just asking, Your Honor. He has an unusual — apparently, an unusual knowledge of weapons and things. I think he is subject to being impeached. He has already testified on direct. I think there is — the inference I'm trying to raise is my client wasn't the only one out there that was armed that night.
>
> THE COURT: What?
>
> DEFENSE COUNSEL: Timothy Davis wasn't the only one out there with a weapon that night.
>
> PROSECUTOR: If that's the case, you can just ask that question. I'm just saying.

THE COURT: I'll sustain.

(Return to open court.)

DEFENSE COUNSEL: Mr. McCaster, didn't you run when this commenced, at the first shot?

WITNESS: Did I run?

DEFENSE COUNSEL: Yes, sir.

WITNESS: No, I didn't run. To be honest, I didn't.

DEFENSE COUNSEL: You weren't scared.

WITNESS: I was really somewhat in shock. Because from the conversation, you wouldn't even think the dude was just going to up and do that.

DEFENSE COUNSEL: Mr. McCaster, are you getting anything in exchange for your testimony here today?

WITNESS: No, sir.

DEFENSE COUNSEL: Do you have any charges — excuse me. That's all I have, Your Honor.

The constitutional argument was not made to the trial court. Although it is unclear whether appellant is arguing that counsel should have been allowed to ask questions about whether other persons present had weapons, or whether appellant is arguing that he should have been allowed to continue questioning that would have led to McCaster's prior bad acts, neither argument has merit. If appellant is arguing that his counsel should have been allowed to ask questions regarding whether other individuals present had weapons, the State indicated it was agreeable to Davis's asking. The defense counsel chose to end that line of questioning. If appellant is proposing that he should have been allowed to question McCaster about his prior bad acts, the issue is not preserved for appeal as no argument was made to the trial court, nor was a ruling made by the trial court on the issue of admissibility of a prior bad act of the witness. Therefore, we find that the trial court did not abuse its discretion.

### IV. Emotional Outburst by Family of the Victim

For his fourth point on appeal, Davis contends that the trial court erred by denying his motion for mistrial after the mother of the victim, upon viewing a postmortem photograph of her son,

cried out in the presence of the jury. The photograph was displayed while the State was questioning a pathologist, as he was trying to explain the gunshot wounds.

Mistrial is an extreme remedy and is proper only when an error is so prejudicial that justice cannot be served by continuing the trial and when it cannot be cured by an instruction. *Gates v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999). The decision to grant a mistrial is within the sound discretion of the trial court, and will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Id.*

We have held that the trial judge is in a superior position to evaluate any prejudicial effect of such an emotional display upon the jury. *Solomon v. State*, 323 Ark. 178, 913 S.W.2d 288 (1996). In *Solomon*, the victim's daughters had approached the jury as the bailiff was escorting the jury from the courthouse for lunch, and created a scene by crying and screaming "I want my momma." There was even an allegation by appellant that the scene was orchestrated. *Id.* However, in concluding that the trial court had not abused its discretion in denying the mistrial motion, this court noted that "we have held that emotional outbursts by the relatives of murder victims are not unusual and are difficult to control. The trial court exercises a wide latitude of discretion in the control of the trial and resorts to the drastic remedy of a mistrial as a last resort." *Id.* (quoting *Venable v. State*, 260 Ark. 201, 538 S.W.2d 286 (1976)). In *Venable*, appellant alleged that the trial court should gave granted the mistrial motions he made after the stepmother of the victim broke down on the witness stand and asked why anybody would want to kill the deceased, and after the victim's wife, an alleged rape victim, ran from the courtroom crying during the prosecutor's summation. There, however, we noted that no accusatory remarks were made or were directed at the accused and that the trial judge was in a better position to evaluate the impact of the occurrences than anyone else. *Venable*, 260 Ark. at 215, 538 S.W.2d at 295. This court held that there was no abuse of discretion in the denial of the motions for mistrial. *Id.*

After the emotional outburst in the present case, the prosecutor apologized to the court and explained that the State had been under the impression that anyone who could not accept this testimony had already left the room. The events did take place in front of the judge and he commented that, not only was the mother taken out of the room before there was a production, the prosecution took steps to ensure that nobody else remained in the

room that would not be able to handle the testimony or the accompanying pictures. As in *Venable, supra,* no accusatory remarks were made by the victim's mother, and she did not direct any remarks toward the accused. We find that the trial court was in the best position to determine any prejudicial effects, and that it did not abuse its discretion by denying the motion for a mistrial.

## V. Lesser-Included Offense Instructions

For his final point on appeal, Davis contends that the trial court erred by not instructing the jury on first-degree and second-degree false imprisonment, as lesser-included offenses of kinapping. The State responds by arguing that the trial court was correct in not instructing the jury as requested by appellant, as first-degree and second-degree false imprisonment offenses are not lesser-included offenses of kidnapping.

We have repeatedly stated that it is reversible error to refuse to instruct on a lesser-included offense when there is the slightest evidence to support the instruction. *Owens v. State,* 354 Ark. 644, 128 S.W.3d 445 (2003). However, this court will affirm a trial court's decision to exclude an instruction on a lesser-included offense only if there is no rational basis for giving the instruction. *Isom v. State,* 356 Ark. 156, 148 S.W.3d 257 (2004). The determination of whether an offense is a lesser-included offense of another is governed by Ark. Code Ann.§ 5-1-110(b) (Repl. 2006). *Hardman v. State,* 356 Ark. 7, 144 S.W.3d 744 (2004).

An offense is so included if:

(1) It is established by proof of the same or less than all the elements required to establish the commission of the offense charged; or

(2) It consists of an attempt to commit the offense charged or to commit an offense otherwise included within it; or

(3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpable mental state suffices to establish its commission.

*Id*; Section 5-1-110(b). An offense must meet one of the three tests to be considered as a lesser-included. *McCoy v. State,* 347 Ark. 913, 69 S.W.3d 430 (2002).

We now turn to the instruction for first-degree false imprisonment. As explained by the court of appeals in *Moore v. State,*

CACR 03-488, slip op. at 1 (Ark. App. Jan. 28, 2004), false imprisonment in the first degree is not a lesser-included offense of kidnapping, as it requires additional elements:

> The mental state required for kidnapping is "purposely," according to Ark.Code Ann. § 5-2-202(1) (Repl.1997). The offense of first-degree false imprisonment is defined in Ark.Code Ann. § 5-11-103(a) (Repl.1997). First-degree false imprisonment requires a culpable mental state of "knowingly." Knowingly is a lesser mental state than purposely. *McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002). Although first-degree false imprisonment does have a lesser-culpable mental state than kidnapping, the mental state is not the only difference in the two offenses. False imprisonment requires proof of two more elements than kidnapping. Kidnapping only requires restraint that is without consent, while false imprisonment requires the lack of consent and restraint without lawful authority. Secondly, false imprisonment requires someone to knowingly restrain another person as to interfere substantially with his liberty *in a manner that exposes that person to a substantial risk of serious physical injury.* Ark.Code Ann. § 5-11-103(a) (Repl.1997) (emphasis added). Kidnapping only requires proof that the appellant acted with the purpose of facilitating the commission of any felony or flight thereafter. The "substantial risk to serious physical injury" element may require the State to prove more serious harm to the victim than necessary on the kidnapping charge.

*Id.* Therefore, pursuant to section 5-1-111(b)(1), false imprisonment is not a lesser-included offense of kidnapping. Additionally, first-degree false imprisonment does not meet Ark. Code Ann. § 5-1-110(b)(2), as committing first-degree false imprisonment is not the same as an attempt to commit kidnapping. Finally, first-degree false imprisonment is not a lesser-included offense pursuant to Ark. Code Ann. § 5-1-111(b)(3), as the injury, or risk of injury, is potentially greater for first-degree false imprisonment, which requires that a person must be exposed to "a substantial risk of serious physical injury." Ark. Code Ann. § 5-11-103(a).

Similarly, false imprisonment in the second degree is not a lesser-included offense of kidnapping, pursuant to section 5-1-111(b)(1) as it also requires an additional element not required to prove kidnapping. Ark. Code Ann.§ 5-1-110(b)(1); Ark. Code Ann. § 5-11-103(a). As noted by the State, second-degree false imprisonment contains the language "without lawful authority."

Ark. Code Ann. § 5-11-104(a). However, kidnapping is different, as no person can consent to it. Second-degree false imprisonment also does not meet the test of section 5-1-111(b)(2), as committing second-degree false imprisonment is not an attempt to commit kidnapping. Finally, pursuant to section 5-1-111(b)(3), second-degree false imprisonment is not a lesser-included offense of kidnapping because, as explained above, the risk of injury is not the only difference between second-degree false imprisonment and kidnapping. Because first-degree false imprisonment and second-degree false imprisonment are not lesser-included offenses of kidnapping, the trial court did not err by not instructing the jury as such.

*Rule 4-3(h) Certification*

Pursuant to Ark. Sup.Ct. R. 4-3(h), we have reviewed the record and have determined that there are no errors with respect to rulings on objections or motions prejudicial to the defendant not discussed above.

Affirmed.