40 P.3d 894

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Romulo LAGAT, Defendant–Appellant,**

**and**

**Edward Piloton, Defendant.**

**No. 23337.**

Supreme Court of Hawai'i.

Feb. 8, 2002.

---

Michael G.M. Ostendorp and Shawn A. Luiz, on the briefs, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ.; RAMIL, J., DISSENTING; ACOBA, J., CONCURRING SEPARATELY.

Opinion of the Court by MOON, C.J.

Following a jury trial,[1] defendant-appellant Romulo Lagat appeals from a May 4, 1999 First Circuit Court judgment of conviction and sentence for: unlawful imprisonment in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–722 (1993); unauthorized entry into motor vehicle (UEMV), in violation of HRS § 708–836.5 (Supp.1996); one count of sexual assault in the third degree and two counts of sexual assault in the fourth degree, in violation of HRS §§ 707–732 and 707–733 (1993); and robbery in the second degree, in violation of HRS § 708–841 (1993). On appeal, Lagat argues that the trial court erred in (1) denying his motion for a mistrial because his right to a fair trial was compromised by the crying of the complaining witness and (2) instructing the jury as to the offense of UEMV.

For the reasons discussed below, we affirm the judgment of conviction and sentence.

1. The Honorable Wendell K. Huddy presided over the jury trial.

## I. BACKGROUND

The charges against Lagat, filed on August 12, 1998,[2] arose as a result of an incident between Lagat, Jane Doe (Lagat's former girlfriend), and Kevin Tsutsui (Doe's date). The evidence adduced at trial revealed the following:

In 1995, Lagat, who was then thirty-five years old, met Doe, the complaining witness, who was then fourteen. They entered into a sexual relationship, which lasted until the end of June 1997. At that time, according to the testimony of Doe, she broke off the relationship. Lagat, on the other hand, understood only that Doe needed "space" and that, therefore, the frequency of their dates would be reduced. It is undisputed that they continued seeing each other, that Doe knew Lagat was still in love with her, and that Lagat organized a birthday party for Doe in July 1997.

On the evening of August 16, 1997, Doe was sitting in a parked automobile with Tsutsui, a man she had started dating earlier that month. Tsutsui and Doe had spent the evening together, and he was dropping her off near her home. They stayed in the parked car for a while, kissing and saying goodbye to each other. After exiting the vehicle, Doe saw Lagat running in her direction from a short distance away. Frightened, she got back into the car with Tsutsui, locked the door, and rolled up the window.

According to Doe, Lagat approached the car and, in a voice loud enough to be heard through the closed windows, demanded that Doe return jewelry he had given her during the course of their relationship. He also threatened Tsutsui. Doe testified that, in response, she rolled down her window to hand Lagat several pieces of jewelry, at which time, Lagat reached in and opened the passenger door. Lagat then pulled Doe out of the car, went inside the vehicle, and began beating Tsutsui. Doe also saw Lagat's nephew, Edward Piloton (Edward), on the driv-

2. Lagat was originally charged with kidnapping, UEMV, two counts of sexual assault in the third degree, sexual assault in the first degree, and robbery in the second degree.

er's side of the car, but was unable to see what he was doing there.

Lagat's testimony, which was translated into English from Tagalog with the aid of an interpreter, paints a different picture. He testified that he had called Doe's home earlier in the evening and was told that she was out. His sister allowed him to use her car, driven by her son Edward, to go to Doe's home, where he parked nearby and awaited her return. After waiting for approximately two hours, he noticed someone exiting a car at around midnight and suspected it was Doe. Lagat walked towards the car to verify that it was in fact she. Lagat testified that he confronted Doe on the sidewalk, asking her why she was returning so late. According to Lagat, Doe, in response, insinuated that Tsutsui had been attempting to coerce her into kissing him. Lagat contends that he then entered Tsutsui's vehicle through the opened car door, admittedly without Tsutsui's permission, and sat in the passenger seat. He asked Tsutsui why he had been pressuring Doe to kiss him. Tsutsui responded in anger to his questioning, saying it was none of Lagat's business, and then grabbed Lagat's shirt. Lagat reacted by punching Tsutsui twice in the face. Lagat then exited the vehicle, and Tsutsui drove off.

It is undisputed that, after the incident, Lagat took Doe to his home, where they had sex, and that Doe did not return to her own home until the following day. Doe testified that Lagat verbally and physically abused her after he took her from Tsutsui's vehicle and forcibly placed her in the car driven by Edward. She stated that: (1) Lagat put his finger into her vagina to see if there was any evidence of sexual intercourse between Doe and Tsutsui; (2) while beating her, Lagat forcibly took her remaining jewelry; (3) she was taken against her will to Lagat's home in the middle of the night; (4) Lagat forced her to have sex with him in a small, cramped walk-in closet that functioned as a bedroom; and (5) Lagat threatened to amputate his hands with a steak knife in order to punish himself for the abuse he had inflicted upon her.

During her testimony, Doe, who was seventeen-years old at the time of trial, began crying and spoke in a hushed tone of voice. Shortly after her testimony began, the trial court ordered a recess in the hope that Doe would regain her composure. The trial resumed shortly afterwards, but Doe was unable to refrain from crying during her testimony. A second recess was called after Doe began testifying with regard to the events that took place in Lagat's walk-in closet/bedroom.

At this juncture of the proceedings, Lagat's counsel moved for a mistrial. Counsel maintained that Doe's crying and her "emotionality" would unduly prejudice Lagat's right to a fair trial. The trial court recognized that Doe had been crying "virtually throughout her testimony" and that the crying was interfering with the record because "the court reporter sometimes ha[d] a hard time picking her up as well as some of the jurors." However, the court denied the motion as premature. The court also directed the prosecutor to "inform the witness to try to control her emotions" and suggested that both parties draft cautionary instructions for possible later use should such instructions prove necessary.

Doe completed her testimony later that same afternoon, after the lunch recess and after the testimony of an expert witness. Doe's afternoon testimony began where it had left off: with the events that took place in Lagat's walk-in closet/bedroom. The record indicates that Doe apparently completed the remainder of her testimony, including cross-examination, without crying and that no unscheduled recesses were necessary to allow her to regain her composure. Having previously suggested that counsel draft cautionary instructions regarding Doe's crying, the trial court queried counsel as to whether such an instruction was necessary. The prosecution objected to the need for a cautionary instruction, noting that Doe had "stopped crying after the long break that she had." Defense counsel agreed, wishing to avoid calling further attention to Doe's crying. Accordingly, no cautionary instruction was given to the jury.

During closing arguments, both the prosecution and the defense highlighted the episodes of Doe's crying. Defense counsel noted that a photograph of Doe, taken at the Sexual Assault Treatment Center only hours after she had been allegedly "raped and kidnaped," showed no signs of recent crying. Defense counsel proceeded to argue that jurors might infer that Doe

> is a tough girl, she doesn't just cry at the drop of a hat. Well, you saw that she does cry at the drop of a hat. She sat up here for over an hour and cried during her direct examination. Why is she upset now? Because she's in an awkward position. She doesn't want to have to be up here and testify about things that aren't true. She doesn't want to put herself in this position. But this story has gathered steam, and it's gathered momentum, and the impact—or frustration that she's felt came to a head right here when she was on the stand, because she cried and cried and cried. She wasn't crying on August 17th of 1997 when this supposedly happened. She wasn't crying then. But why is she crying now? She was crying on the phone when she called her mom. Why is she crying then? She was busted then. She was in a bad situation. She was crying because she was busted.

Defense counsel later made another express reference to Doe's propensity to cry by stating that "[s]he pretends to be a nice, sweet girl. She cries on the witness stand. But underneath there is a very conniving sixteen-year-old [sic], a very sophisticated sixteen-year-old [sic]."

The prosecution's rebuttal argument also addressed the fact that Doe cried on the stand. The prosecutor argued:

> If you look at [Doe] in one of the photos at the [Sexual Assault Treatment Center], she doesn't look like she's been crying. [Defense counsel] said, oh, you know, that's bad for her because she's not crying in those pictures. You saw [Doe] on the stand. Yes, [Doe] was crying when she first came on. But at the end—by the end, she had stopped crying. You know, every once in a while, tears would come down. Okay, so just because she's not full

balling [sic] in these pictures doesn't mean nothing happened to her. . . . So if you think about it, you don't just cry a whole day.

The trial court instructed the jury, among other things, that they should "not be influenced by pity for a defendant or a witness or by passion or prejudice against a defendant or a witness." After deliberating, the jury found Lagat guilty of UEMV and robbery in the second degree, as charged. On all of the other counts, the jury found Lagat guilty of lesser included offenses. Lagat timely appealed.

## II. STANDARDS OF REVIEW

### A. Denial of Motion for Mistrial

 The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. State v. Loa, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 (citations omitted), reconsideration denied, 83 Hawai'i 545, 928 P.2d 39 (1996). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Ganal, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting State v. Furutani, 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994) (internal quotation marks omitted)).

### B. Jury Instructions

" 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading,' " State v. Kinnane, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (quoting State v. Kelekolio, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993) (citations omitted)). . . .

" '[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' " State v. Pinero, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) . . . (quoting Turner v. Willis,

59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction. *State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. *See Yates v. Evatt,* 500 U.S. 391, 402–03 [111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432] (1991)[.]

*State v. Jenkins,* 93 Hawai'i 87, 99–100, 997 P.2d 13, 25–26 (2000) (some citations omitted).

### III. *DISCUSSION*

#### A. *Denial of the Motion for Mistrial*

Lagat argues that the trial court abused its discretion by denying his motion for mistrial "on the ground that the complaining witness cried hysterically throughout the presentation of her testimony." Lagat contends that the sight of Doe's crying so inflamed the jury that his constitutional due process right to a fair trial was compromised.

In support of his argument, Lagat cites three Hawai'i cases, none of which are persuasive. In *State v. Rulona,* 71 Haw. 127, 129, 785 P.2d 615, 616 (1990), this court held that a number of errors committed during trial required that the judgment be vacated and that the case remanded for a new trial. Among these errors was the fact that the trial court had permitted the alleged victim of a sexual assault, an eight-year-old, to testify while seated on the lap of a sexual abuse counselor. *Id.* at 129–30, 785 P.2d at 616–17. Although HRS § 621–28 (1985) provided that "[a] child less than fourteen years of age, involved in a judicial proceeding, ... shall have the right to be accompanied by a ... victim/witness counselor," this court held that

it was an abuse of discretion to allow "such a prejudicial scenario," where there was no compelling necessity to do so. *Id.* at 130, 785 P.2d at 617. The record revealed that the child was "frightened to be there as a witness[ ] and would feel better if she sat on the sexual abuse counselor's lap." *Id.* This court acknowledged that "[m]ost witnesses appearing in trial for the first time, even adults, are frightened," but held that such apprehension was insufficient to demonstrate a compelling necessity. *Id.*

In *State v. Suka,* 70 Haw. 472, 777 P.2d 240 (1989), the fifteen-year-old complaining witness in a sexual assault and kidnapping case was allowed to testify while a representative of the Victim Witness Kokua Program sat next to her and then stood behind her and placed her hands on the complainant's shoulders. *Id.* at 473, 777 P.2d at 241. This court agreed with the appellant's contention that his due process rights were violated, noting that HRS § 621–28 was inapplicable given the age of the complaining witness. *Id.* at 477, 777 P.2d at 243. Additionally, this court determined that allowing a victim counselor to take the stand alongside the complaining witness could "have had the effect of conveying to the jury [the counselor's] belief that complainant was telling the truth, thereby denying defendant the right to a fair and impartial trial." *Id.* at 476, 777 P.2d at 242. Again, the record did not support the conclusion that the complainant would have been unable to testify absent the presence of the counselor and indicated only that the "complainant was having difficulty testifying without crying[.]" *Id.* at 477, 777 P.2d at 243.

Finally, Lagat directs this court to *State v. Palabay,* 9 Haw.App. 414, 844 P.2d 1 (1992), *cert. denied,* 74 Haw. 652, 849 P.2d 81 (1993). In *Palabay,* the Intermediate Court of Appeals (ICA) held that it was error for the trial court to allow the complaining witness, a twelve-year-old girl who was the alleged victim of a sexual assault, to testify while holding a teddy bear. *See id.* at 420–24, 844 P.2d at 5–7. The ICA framed the issue as "whether a defendant's right to a fair trial is violated when a child witness is allowed to hold an inanimate object such as a teddy bear while testifying[.]" *Id.* at 422, 844 P.2d

at 6. Ultimately, the ICA accepted the appellant's argument that the teddy bear might bolster the complainant's credibility and that the trial court abused its discretion because no "compelling necessity" required the witness to use a prop. *See id.* at 424, 844 P.2d at 7.

The foregoing cases are inapposite to Lagat's case because, in all three cases, the issue involved the presence of additional people or the use of props at the witness stand, not the presence of tears rolling down the complaining witness's cheeks. There is no indication in any of the above cases that crying, alone, constituted a violation of a defendant's constitutional rights.

As noted by the Colorado Court of Appeals, other jurisdictions have indicated that outbursts of emotion by witnesses do not automatically prejudice a defendant's right to a fair trial. In *People v. Ned*, 923 P.2d 271 (Colo.Ct.App.), *cert. denied*, 923 P.2d 271 (Colo.1996), the mother of the victim was asked questions that required her to testify about the actual killing of her child. *See id.* at 276. The witness began "crying, thrashing about in the witness stand, shaking herself back and forth, screeching, screaming, and stamping her feet." *Id.* The trial court found that, "although the display was emotional, it was not 'necessarily out of place' or provoked by anything except the circumstances surrounding the death of [the witness's] son." *Id.* Perceiving no error, the Colorado Court of Appeals stated that

> other jurisdictions have approved the denial of a mistrial when witnesses have become distraught. *See Venable v. State*, 260 Ark. 201, 538 S.W.2d 286 (1976) (no abuse of discretion in denying mistrial where victim's stepmother broke down on the witness stand and asked why anyone would want to kill the victim; jury admonished)[;] *Duncan v. State*, 256 Ga. 391, 349 S.E.2d 699 (1986) (no abuse of discretion in denying mistrial following outburst by victim's mother while she was on the stand; jury instructed to ignore the outburst)[;] *Commonwealth v. Andrews*, 403 Mass. 441, 530 N.E.2d 1222 (1988) (no abuse of discretion in denying mistrial in murder case based upon spontaneous outburst by victim's

mother while identifying photograph of victim; jury immediately instructed to disregard the emotional display).

*Ned*, 923 P.2d at 276. The facts of the case before this court are more akin to *Ned* than to *Rulona, Suka*, or *Palabay*.

■ Lagat's argument that Doe "cried hysterically throughout the presentation of her testimony" is an overstatement. The record indicates that Doe cried initially when she took the witness stand, that she continued crying after a recess was called, and that the judge felt it necessary to call a second recess when it became obvious that she was not in control of her emotions.

During the second recess, the trial court specifically directed the prosecutor to caution the witness, discussed the potential for prejudice, and suggested that counsel draft cautionary instructions in the event they should prove necessary at a later stage of the trial. When Doe returned to the witness stand in the afternoon, she completed a lengthy direct and cross-examination without any further outbursts. The trial court took appropriate and successful steps to minimize any prejudicial effect that may have resulted from Doe's crying. Lagat's counsel expressly elected not to pursue the cautionary instruction to avoid any further attention being drawn to the crying.

Moreover, Lagat's bald assertion that he was denied the right to a fair trial, standing alone, is insufficient to establish a prima facie showing of prejudice. Based on our review of the record, we refuse to second-guess the trial court concerning the prejudice, if any, that occurred as a result of Doe's crying during the initial stages of her testimony. The fact that the jury returned guilty verdicts of lesser included offenses in four counts suggests that the jury was not completely swayed in favor of the prosecution by virtue of Doe's outbursts. Accordingly, we hold that the trial court did not abuse its discretion in denying Lagat's motion for mistrial.

## B. *Erroneous Jury Instructions*

Lagat contends that the trial court erroneously instructed the jury on the offense of

UEMV. The offense of UEMV is defined as follows:

A person commits the offense of unauthorized entry into motor vehicle if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle with the intent to commit a crime against a person or against property rights.

HRS § 708–836.5(1). UEMV is a class C felony. HRS § 708–836.5(2).

The court's instructions to the jury included a definition of the offense, which tracked the language of the statute verbatim and added:

There are three material elements of the offense of Unauthorized Entry into Motor Vehicle, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That on or about August 17, 1997, in the City and County of Honolulu, State of Hawaii, the Defendant Romulo Lagat entered or remained unlawfully in a motor vehicle; and

2. That the Defendant did so intentionally or knowingly; and

3. That the defendant did so with intent to commit a crime against the person of Kevin Tsutsui.

Intentionally, knowingly, or recklessly causing bodily injury to another person is a crime against [the] person.

The UEMV instructions were given over the objection of Lagat's counsel, who stated for the record:

Our objection, your Honor, is that there's no actual charge [of] Assault in the Third Degree in this case and that this is not the kind of case that this particular offense was made for. We believe that Unauthorized Entry into Motor Vehicle should apply more to the breaking into vehicles to steal the property within it or for carjackings, and this is not what was anticipated by the legislature.

Although not specifically argued or explained, we recognize that Lagat's objection may be interpreted as indicating that, if the prosecution alleges that assault in the third degree is the intended crime for purposes of the UEMV statute, then it must

charge third degree assault in addition to UEMV. Such argument is without merit. In *State v. Robins*, 66 Haw. 312, 660 P.2d 39, *reconsideration denied*, 66 Haw. 679, 660 P.2d 39 (1983), the defendant successfully moved to dismiss a burglary indictment on the ground that the specific crime that the defendant had intended to commit should have been set forth in the indictment, rather than referred to generally as "with intent to commit therein a crime against a person or property rights[.]" *Id.* at 312–13, 660 P.2d at 40. Because the burglary statutes (HRS §§ 708–810 and 708–811) are identical to the UEMV statute to the extent that each essentially provides that a person commits burglary/UEMV if he or she intentionally enters or remains unlawfully in a building/motor vehicle with the intent to commit therein a crime against a person or against property rights, *Robins* is instructive. In reversing the dismissal, the court in *Robins* held that the crime intended to be committed does not have to be committed in order to make the act of entering or remaining on the premises the crime of burglary; only the intent must be formed. *Id.* at 314, 660 P.2d at 41. Thus, "intentionally entering or intentionally remaining unlawfully [in a motor vehicle] with the intent to commit any crime against a person or property rights constitutes [UEMV] and, therefore, it cannot logically be said that specifying the particular crime intended to be committed is, under our statutes, an essential element which must be alleged in order to charge the crime of [UEMV]." *See Robins*, 66 Haw. at 314–15, 660 P.2d at 41.

In his concurring opinion, Justice Acoba also highlights the similarities between the burglary statute and the UEMV statute. In doing so, he attempts to inject a requirement that the case law does not, in fact, mandate. In *Robins*, this court concluded that, within the context of our burglary statutes, "the particular crime intended to be committed" is not "an essential element which must be alleged[.]" *Robins*, 66 Haw. at 315, 660 P.2d at 41. The holding in *Robins* remains valid, and we extend its reasoning to the UEMV statute. In this case, Lagat did not raise any arguments involving his "right ... to be

informed of the nature and cause of the accusation" as provided by the sixth amendment to the United States Constitution and article I, section 14 of the Hawai'i Constitution. Had he done so, his argument would surely have failed. It is transparent from an examination of the record that no unfair surprise nor resulting prejudice ensued from the prosecution's failure to list in the indictment the particular crime Lagat intended to commit under the UEMV statute. It should also be pointed out that Lagat failed to move for a bill of particulars and that the trial court was under no obligation to require one simply because the particular crime underlying the UEMV charge was not alleged with specificity. Although it certainly may be preferable for the prosecution to allege the particular crime intended to be committed under the UEMV statute, we refuse to require it where no unfair surprise or prejudice results. Justice Acoba disagrees, and, as evinced by his concurring opinion, would require the prosecution to designate the specific crime intended to be committed. However, in straying from the facts of this case and the arguments raised by the parties, Justice Acoba's concurrence indulges in speculation regarding abstract questions of law. The concurring opinion is precisely the sort of advisory opinion that prudential rules of judicial self-governance caution against. *See Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw. 81, 87, 734 P.2d 161, 165 (1987) (citing *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

■ In this appeal, Lagat frames his contention as a challenge to the jury instructions; however, he argues that "[t]he court should have dismissed [the UEMV charge] or entered [a] judgment of acquittal based upon the fact that the Legislature did not intend to use HRS [§ ] 708–836.5 in the manner in which the state used it." Lagat suggests that the "motive for the prosecution to improperly use [the UEMV statute]" was to charge him with a greater offense, *i.e.*, UEMV is a class C felony, whereas the only comparable charge that could have been made against him was assault in the third degree, which is only a misdemeanor. La-

gat's argument, however, ignores the well-settled rule that "it is generally no defense to an indictment under one statute that the accused might have been charged under another, and the matter is necessarily and traditionally in the discretion of the prosecuting attorney." *State v. Rabago*, 67 Haw. 332, 334, 686 P.2d 824, 826 (1984) (*citing State v. Modica*, 58 Haw. 249, 567 P.2d 420 (1977)).

With regard to Lagat's argument that "the Legislature did not intend to use HRS [§ ] 708–836.5 in the manner in which the state used it," we note that this court has long recognized that, "[w]hen construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *State v. Kotis*, 91 Hawai'i 319, 327, 984 P.2d 78, 86, *reconsideration denied*, 91 Hawai'i 319, 984 P.2d 78 (1999).

> The construction of a statute is a question of law which the appellate court reviews de novo.... Departure from the literal construction of a statute is justified only when such construction would produce an absurd and unjust result and the literal construction is clearly inconsistent with the purposes and policies of the statute.

*State v. Villeza*, 85 Hawai'i 258, 272–73, 942 P.2d 522, 534–35 (1997) (internal quotation marks, brackets, and citations omitted).

■ We recognize that, as a general rule, penal statutes are to be strictly construed, and any ambiguities should be interpreted in favor of defendants. *See State v. Ganal*, 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (citation omitted). However, there is no ambiguity contained in the language of the UEMV statute. HRS § 708–836.5 plainly states that it is unlawful to enter into a motor vehicle in order to, among other things, commit a crime against a person. Therefore, the statute specifically penalizes the conduct Lagat was found to have engaged in by the jury.

Inasmuch as the plain language of the UEMV statute is, on its face, clear and unambiguous, we conclude that Lagat's argument with respect to legislative intent is

without merit. We also conclude that the jury instructions in this case were not erroneous. The instructions not only tracked the language of the statute, but adequately and understandably apprised the jury of the law to be applied in its deliberation; thus, it cannot be said that the instructions were prejudicially insufficient, inconsistent, or misleading. *See State v. Nakamura*, 65 Haw. 74, 79, 648 P.2d 183, 187, *reconsideration denied*, 65 Haw. 682, 648 P.2d 183 (1982).

## IV. *CONCLUSION*

Based on the foregoing, we affirm the trial court's judgment of conviction and sentence.

## Concurring Opinion of ACOBA, J.

Although it is said that the crime or crimes intended need not be alleged, I believe it is preferable that the crime or crimes a defendant purportedly intended to commit in entering a motor vehicle be alleged in the charging document in a prosecution for unauthorized entry into motor vehicle (UEMV), Hawai'i Revised Statutes (HRS) § 708–836.5 (Supp.2000), or that a bill of particulars as to such crimes be freely granted.

## I.

In applying the UEMV statute, the reference to analogous case law concerning the burglary statutes, HRS §§ 708–810 (1993) and 708–811 (1993), is apt, inasmuch as the only express distinction between the offenses is that the former pertain to motor vehicles and the latter to buildings. The gravamen of the burglary and the UEMV offenses is the intent to commit a crime against a person or property. Thus, although "the crime alleged ... is that of intentionally entering or intentionally remaining unlawfully on the described premises[,] ... what makes that act the crime of burglary [or UEMV] ... is the intent to commit a crime against a person or property rights." *State v. Robins*, 66 Haw. 312, 314, 660 P.2d 39, 41 (1983). As the facts

indicate, in objecting to the elements instruction in this case, the defense argued, in part that, "there's no actual charge [of] Assault in the Third Degree in this case," apparently referring to the absence of an allegation of the specific "crime against a person or property" involved.[1] The defense thus raises an issue previously considered in connection with identical statutory language employed in burglary prosecutions.

While this court has indicated that, "under our [burglary] statutes[,]" "the particular crime intended to be committed" is not "an essential element which must be alleged," *id.* at 315, 660 P.2d at 41, it was acknowledged that, "[n]evertheless, the majority of courts in various jurisdictions passing upon whether the crime of burglary has been sufficiently alleged ... have upheld timely challenges to the sufficiency of indictments where the specific crime intended to be committed has not been alleged." *Id.* Those jurisdictions that require the prosecution to plead the crime a defendant intended in committing a burglary, explain that such information is needed in order to place a defendant on complete notice of the charges against him or her. *See, e.g., Lanier v. State*, 733 So.2d 931, 936 (Ala.Crim. App.1998) ("Absent an allegation in Lanier's indictment charging first-degree burglary that Lanier intended to commit a specific crime while in the Lawson's basement, Lanier was not put on notice of the crime of which he was accused and which he had to defend against.").

Despite the fact that such "holdings are treated as a general rule in compendiums of the law dealing with the subject," *Robins*, 66 Haw. at 315, 660 P.2d at 41 (citations omitted), this court decided that, "[i]nasmuch as we have here an indictment specifying all the necessary elements to constitute the crime of burglary, ... the lack of an allegation of the specific crime intended to be committed," *id.* at 315, 660 P.2d at 41–42 (citation omitted), did not violate the constitutional provisions

---

1. It is unclear whether the defense sets forth two grounds in opposition to the elements instruction or a single, alternate contention: the first ground as quoted in the text, *supra*, "*and* [the second,] that this is not the kind of case that this particular offense was made for[;] ... [UEMV] should apply more to breaking into vehicles to steal property within it or for carjackings" (emphasis added); or that the defense's reference to the lack of an assault charge was intended to support its view that the UEMV statute applied only to intended property crimes.

relating to grand jury indictments.[2] *See id.* However, *Robins* viewed as "[t]he much more difficult question . . . whether an indictment which does not set forth the crime intended to be committed by the accused violates his [or her] right . . . 'to be informed of the nature and cause of the accusation.'" *Id.* at 315, 660 P.2d at 42 (quoting U.S. Const. amend. VI, Haw. Const. art. I, § 14);[3] *see also State v. Daly,* 4 Haw.App. 52, 54, 659 P.2d 83, 85 (1983) (explaining that, for an indictment to be valid, it must, *inter alia,* "'apprise[ ] the defendant of what he [or she] must be prepared to meet'") (quoting *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962)); *State v. Jendrusch,* 58 Haw. 279, 281, 567 P.2d 1242, 1244 (1977) (finding complaint defective because it "fail[ed] to meet the requirement that an accused must be informed of the nature and cause of the accusation against him [or her]" (internal quotation marks and citation omitted)).

As to that question, this court observed that, on appeal, the appellate court "must look to all of the information supplied to [the defendant] by the State to the point where the court passes upon the contention that his [or her] right has been violated," *Robins,* 66 Haw. at 317, 660 P.2d at 42–43, and that, "on the record [ (there),]" there was "no violation of the right to be informed." *Id.* This court noted, however, that, "given the evidence presented to the grand jury," *id.* at 317 n. 3, 660 P.2d at 43 n. 3, it saw "no reason" why "the prosecutor should have been reluctant to go ahead and specify that theft was the intent." *Id.* In a caveat to its holding, *Robins* cautioned that there may be "cases in which a general allegation such as that used here[,] combined with a deviation in theory from that presented to the grand jury[,] will result in a claim of unfair surprise and prejudice," in which event, "[s]uch cases will have

to be dealt with on a case[-]by[-]case basis." *Id.* at 317 n. 4, 660 P.2d at 43 n. 4

If, indeed, the crime intended is apparent from the grand jury transcript, I also see no reason why, as *Robins* indicated, the prosecution should not specify the crime intended. A general allegation invites "unfair surprise[ ] and [resulting] prejudice." *Id.* at 315–16, 660 P.2d at 42. Moreover, resort to the record is an indirect method of ascertaining the crimes supposedly intended and may give rise to disputed issues of whether the record adequately and sufficiently provided such notice. Additionally, a search of the record for such information places an unnecessary burden not only on the parties, but also on the trial court that must initially make such a determination, and on the appellate courts, as it did in *Robins.*

**II.**

Obviously, the failure to prove the intent to commit a crime in a motor vehicle, beyond a reasonable doubt, must result in an acquittal of the charge of UEMV. Conceivably, in limited situations, such a failure may result in a finding of simple trespass, which is a violation and not a crime. In this regard, the significance of identifying the crime(s) the prosecution purports was or were intended to be committed is prompted by the dissenting opinion of Justice Ramil, which maintains that the overlapping coverage under both the second degree burglary statute, HRS § 708–811, and the UEMV statute, in cases involving vehicles used for lodging, evinces an ambiguity requiring resort to legislative history, *see* dissent at 504, 40 P.3d at 906, which, in turn, is consistent with Defendant's position. *See supra* note 1.

A person who enters or remains unlawfully in or on premises commits simple trespass. *See* HRS § 708–815 (1993).[4] "Premises" includes "any building." HRS § 708–800

2. The fifth amendment to the United States Constitution and article I, section 10 of the Hawai'i Constitution state, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"

3. The United States Constitution, amendment VI, and article I, section 14 of the Hawai'i Constitution state that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation[.]"

4. HRS § 708–815 reads:

**Simple trespass.** (1) A person commits the offense of simple trespass if the person knowingly enters or remains unlawfully in or upon premises. (2) Simple trespass is a violation.

(1993). As Justice Ramil points out, the definition of "building" in HRS § 708–800 includes not only structures ordinarily thought of as buildings, but also, *"any* vehicle" used for lodging. *See* dissenting opinion at 504, 40 P.3d at 906. Governed by the definitions section of HRS § 708–800, the terms used for burglary offenses as stated in HRS §§ 708–810 and 708–811, and for the UEMV statute as stated in HRS § 708–836.5, share a common construction.

The general reference to "motor vehicle" in HRS § 708–836.5(1), then, would arguably bring within its purview "any vehicle ... used for lodging." HRS § 708 800. Because "building" includes, by definition, a vehicle used for lodging, one who enters such a vehicle is potentially subject to a charge of UEMV. However, if no crime is committed in the vehicle and the intent to commit a crime is not proven, the defendant would be subject only to the violation offense of simple trespass, *i.e.,* unlawfully entering "premises," that is, a vehicle falling within the definition of a "building."

By way of illustration, a person who breaks into a camper may be charged with UEMV. His or her claim that entry was not for the purpose of committing a crime, but to seek shelter, may entitle him or her to a lesser included instruction [5] on simple trespass. *See, e.g., State v. Williams,* 6 Haw. App. 17, 18, 708 P.2d 834, 835 (1985) ("Criminal trespass in the first degree is a lesser included offense of burglary in the first degree.... The primary difference between burglary in the first degree and criminal trespass in the first degree is the presence or

absence of an intent to commit in the building a crime against a person or against property rights."). As where a vehicle not used for lodging is involved, in this situation too, the defendant would have to know what crimes the prosecution claims the defendant intended to commit in order to properly prepare for trial and to defend against the offense of UEMV. Thus, the dissent highlights the importance in UEMV prosecutions of determining the crime against the person or property alleged to have been intended by a defendant.

### III.

In the event the prosecution chooses not to specify the crimes intended, trial courts should freely grant bills of particulars for identification of such crimes. *See State v. Balanza,* 93 Hawai'i 279, 286, 1 P.3d 281, 288 (2000) ("A trial court has the discretion to order a bill of particulars, and it must exercise this discretion *in consideration of the purpose of a bill of particulars, which is to help the defendant prepare for trial and to prevent surprise."* (Emphasis added.) (Citing *State v. Reed,* 77 Hawai'i 72, 78, 881 P.2d 1218, 1224 (1994).)). Although *Robins* noted that "a bill of particulars is discretionary with the judge under Rule 7(a), Hawai'i Rules of Penal Procedure," [6] 66 Haw. at 316, 660 P.2d at 42, the failure to grant such a motion in the event a question as to the nature of a general allegation arises would amount, in my view, to an abuse of discretion. As *Robins* suggested, the intent to commit a crime against a person or property distinguishes burglary or, in this case,

---

**5.** HRS § 701–109(4) (1993) determines whether an offense is a lesser included offense of another. It explains that

> [a]n offense is so included when ... [i]t is established by proof of the same or *less than all the facts required to establish the commission of the crime charged*[.]

(Emphasis added.)

As stated *supra,* a person commits simple trespass by "knowingly enter[ing] or remain[ing] unlawfully in or upon premises." HRS § 708–815. " 'Premises' includes any building and any real property," HRS § 708–800; and " '[b]uilding' includes any structure, and .. any vehicle .. used for lodging of persons therein." *Id.* Conceivably, therefore, a person may be guilty of simple trespass by knowingly entering or remain-

ing unlawfully in a vehicle used as lodging. Thus, simple trespass is a lesser included offense of UEMV if a defendant accused of UEMV broke into a vehicle used for lodging, such as a mobile home or camper.

**6.** The rule regarding bills of particulars is now set forth in the Hawai'i Rules of Penal Procedure Rule 7(g), which states:

> (g) **Bill of Particulars.** The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within 10 days of arraignment or at such other later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

UEMV. In charging UEMV, the prosecution must have discerned a rational basis in the facts for inferring an accused's intent to commit certain crimes and, therefore, should be required to designate such crimes.

### Dissenting Opinion by RAMIL, J.

I respectfully dissent. In my view, although the language of the UEMV statute is clear on its face, the statutory scheme and stated legislative intent are clearly at odds with the statute's application in Lagat's case. At the very least, this discrepancy creates an ambiguity that must be addressed. As such, I must disagree with the majority's view that adopts the plain language of the statute while disregarding equally clear evidence that calls the application of the statute in Lagat's case into doubt.

As the majority points out:

Departure from the literal construction of a statute is justified only when such construction would produce an *absurd and unjust result* and the literal construction is *clearly inconsistent with the purposes and policies of the statute.*

Majority at 499, 40 P.3d at 901 (citing *State v. Villeza*, 85 Hawai'i 258, 272–73, 942 P.2d 522, 536 (1997) (internal quotation marks, brackets, and citations omitted)) (emphases added). Additionally,

we have rejected an approach to statutory [interpretation] which limits us to the words of a statute, no matter how clear they may appear upon perfunctory review. For we recognize our primary duty [in interpreting statutes] is to ascertain the intention of the legislature and to implement that intention to the fullest degree, and where there is ... material evidencing legislative purpose and intent, there is no reason for a court to seek refuge in "strict construction," "plain meaning," or "the popular sense of the words."

*Kaiama v. Aguilar*, 67 Haw. 549, 554, 696 P.2d 839, 842 (1985). Thus, when turning to the history of a statute to ascertain whether the legislature had a different meaning in mind when it adopted the language in question, the court must "do so with the recognition that only [a clear] showing of contrary intentions from that data would justify a

limitation on the 'plain meaning' of the statutory language." *Id.* (citing *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)).

As noted in *State v. Aplaca,* 96 Hawai'i 17, 25 P.3d 792 (2001), "[t]his court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning. HRS § 1–15(2) (1993)." *Id.* at 22, 25 P.3d at 797 (citations omitted) (ellipsis points in original).

In Lagat's case, the statutory phrase "intent to commit a crime against a person," reading it out of context, specifically prohibits Lagat's actions at first glance. However, further inquiry into the statutory scheme reveals evidence that the legislature enacted HRS § 708–836.5 for a purpose at odds with the application of the statute in Lagat's case.

### A. Section 708–836.5 Commentary and Statutory Scheme

The commentary to HRS § 708–836.5 (Supp.2000) states, "Act 87, Session Laws 1996, added this section to the penal code and made the offense of unauthorized entry into motor vehicle a class C felony *due to the increased number of car thefts in the State.*" (Emphasis added.) Also, HRS § 708–836.5 is found in HRS chapter 708, "Offenses Against Property Rights," under Part IV, "Theft and *Related Offenses.*" (Emphasis added.)

These legislative choices, specifically the overt commentary to the UEMV statute, suggest the legislature had a very specific purpose in mind when enacting the UEMV statute. Any general application of the statute, without requiring that Lagat's criminal conduct be *related* to theft, would not only exceed the bounds of the statute's stated purpose, but would unnecessarily "trump" other statutes.

### B. Second Degree Burglary Rendered Superfluous

It is a rule of statutory construction that "courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void,

or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Keliipuleole v. Wilson*, 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997).

One such statute that would be rendered superfluous by the majority's interpretation of the UEMV statute is second degree burglary, HRS § 708–811 (1993).[1] Like the UEMV statute, the burglary statutes are found in Chapter 708. The wording of the UEMV statute directly models the wording of the second degree burglary statute. The only difference between the two statutes is that the word "building," as it appears in the second degree burglary statute, is replaced with the phrase "motor vehicle" in the UEMV statute. *See supra* note 1. Both the UEMV and second degree burglary statutes are class C felonies. *See* HRS § 708–811(2)(1993); HRS § 708–836.5(2) (Supp. 2000).

An interpretation of the UEMV statute that prohibits *any* crime committed in a vehicle (including simple assault), would render the second degree burglary statute superflu-

1. HRS § 708–811 states:

 **Burglary in the second degree.** (1) a person commits the offense of burglary in the second degree if the person intentionally enters or remains unlawfully in a building with intent to commit therein a crime against a person or against property rights.
 (2) Burglary in the second degree is a class C felony.

2. HRS § 708–800 (1993) states:

 "Building" includes any structure, and the term also includes *any vehicle*, railway car, aircraft, or watercraft *used for lodging of persons therein*; each unit of a building consisting of two or more units separately secured or occupied is a separate building.
 (Emphases added.)

3. FLA. STAT. ANN. § 812.133 (West 2001) ("**Carjacking.** "Carjacking" means the taking of a motor vehicle which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the motor vehicle, when in the course of the taking there is the use of force, violence, assault, or putting in fear."); GA. CODE ANN. § 16.5.44.1 (2001) ("**Hijacking a motor vehicle.** (b) A person commits the offense of hijacking a motor vehicle when such person while in possession of a firearm or weapon obtains a motor vehicle from the

ous as it pertains to vehicles. The definition section applicable to the burglary statutes defines "building" to include vehicles "used for lodging."[2] The majority's interpretation of the UEMV statute eliminates the need for that part of the second degree burglary statute, as the UEMV statute criminalizes *all* crimes committed upon unauthorized entry of *any* vehicle, whether or not the vehicle is used for lodging. If the legislature intended to criminalize Lagat's conduct (*i.e.*, assault) under the UEMV statute, a better route would have been to amend the burglary statute to model those of other jurisdictions who have enacted similar statutes.

### C. *Other jurisdictions*

The uncertainty and ambiguity presented by the Hawai'i UEMV statute prompts a review of other jurisdictions with similar statutes. Some jurisdictions have enacted "carjacking" statutes, drafted specifically to cover the taking of a motor vehicle from a person or custody of another—these statutes take on a form very similar to general robbery statutes.[3] Other jurisdictions have opt-

person or presence of another by force and violence or intimidation or attempts or conspires to do so."); 720 ILL. COMP. STAT. 5/18–3 (West 2001) ("**Vehicular hijacking.** (a) A person commits vehicular hijacking when he or she takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force."); IND. CODE ANN. § 35–42–5–2 (West 2001) ("**Carjacking.** A person who knowingly or intentionally takes a motor vehicle from the person or the immediate presence of another by the use of force or by threatening the imminent use of force."); MD. ANN. CODE art. 27, § 348A (2000) ("**Carjacking.** (b)(1) An individual commits the offense of carjacking when the individual obtains unauthorized possession or control of a motor vehicle from another individual in actual possession by force or violence, or by putting that individual in fear through intimidation or threat of force or violence."); MICH. COMP. LAWS ANN. § 750.529a (West 2001) ("**Carjacking.**(1) A person who by force or violence, or by threat of force or violence, or by putting in fear robs, steals, or takes a motor vehicle as defined in section 412 from another person, in the presence of that person or the presence of a passenger or in the presence of any other person in lawful possession of the motor vehicle, is guilty of carjacking...."); S.C. CODE ANN. § 16–3–1075 (Law.Co-op.2001) ("**Felony of carjacking; penalties.** (B) A person is guilty of the felony of

ed to include a UEMV-like statute as part of their general burglary statutes.[4] These jurisdictions are specific when defining the types of crimes covered by the statute, most jurisdictions listing felonies and theft-related crimes as the underlying offenses. *See supra* note 4. Hawaiʻi's UEMV statute does not share this level of clarity.

Although it is not the judiciary's job to redraft statutes, it is our job to give meaning to the chosen words of the legislature and exert effort to insure that the meaning coincides with legislative intent. The ambiguities presented by the UEMV statute as drafted do not convince me that this duty will be fulfilled by affirming Lagat's conviction under this statute.

carjacking who takes, or attempts to take, a motor vehicle from another person by force and violence or by intimidation while the person is operating the vehicle or while the person is in the vehicle...."); VA. CODE ANN. § 18.2–58.1 (West 2001) ("**Carjacking; penalty.** (B) "carjacking" means the intentional seizure or seizure of control of a motor vehicle of another with intent to permanently or temporarily deprive another in possession or control of the vehicle of that possession or control by means of partial strangulation, or suffocation, or by striking or beating, or by other violence to the person, or by assault or otherwise putting a person in fear of serious bodily harm, or by the threat of presenting of firearms, or other deadly weapon or instrumentality whatsoever....")

4. CAL. PENAL CODE § 459 (West 2001) ("Chapter 2. **Burglary. Definition.** Every per-

son who enters any house, room, apartment, ... any house car, ... vehicle ..., when the doors are locked, ... with intent to commit grand or petit larceny or any felony is guilty of burglary."); OKLA. STAT. ANN. tit. 21, § 1435 (West 2001) ("**Burglary in second degree—Acts constituting.** Every person who breaks and enters any building or part of any building, room, booth, tent, railroad car, automobile, truck, trailer, vessel, or other structure or erection, in which any property is kept, ... with intent to steal any property therein or to commit any felony, is guilty of burglary in the second degree."); TENN. CODE. ANN. § 39–14–402 (2000) ("**Burglary.** (a) A person commits burglary who, without effective consent of the property owner: ... (4) Enters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault.")