Cite as 2020 Ark. App. 54

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CR-19-623

| | |
|---|---|
| GARY CHAMBERS | **Opinion Delivered:** January 29, 2020 |
| APPELLANT | APPEAL FROM THE CLARK COUNTY CIRCUIT COURT [NO. 10CR-18-68] |
| V. | |
| STATE OF ARKANSAS | HONORABLE BLAKE BATSON, JUDGE |
| APPELLEE | |
| | AFFIRMED |

## MEREDITH B. SWITZER, Judge

Appellant Gary Chambers was convicted by a Clark County Circuit Court jury of the offenses of impairing operation of a vital public facility, second-degree battery, and aggravated assault on a law enforcement officer. Chambers was sentenced to a total of forty years' imprisonment. On appeal, Chambers argues the circuit court erred in denying his motions for directed verdict on the offenses of second-degree battery and impairing operation of a vital public facility.[1] He further contends the circuit court erred in denying his request to represent himself during trial. We affirm.

## I. *Trial Testimony*

Steven Parrott testified that on April 20, 2018, he booked Chambers into the Clark County Jail as one of his duties as a jailer for the Clark County Sheriff's Department. One

---

[1]Chambers does not appeal his conviction for aggravated assault on a law enforcement officer.

of the booking procedures requires an inmate to strip, squat down, and cough to ensure no contraband is smuggled into the jail. Parrott testified Chambers was resistant to perform this task and complained that they were "messing with the wrong MF'er." As Parrott attempted to lead Chambers to general population, Chambers swung at him. The other jailer on duty, Sam Burdett, assisted Parrott in taking Chambers to the ground, but Chambers continued to resist. Robert Jones, an Arkadelphia police officer who was present at the jail, also assisted in subduing Chambers. According to Parrott, after Chambers was handcuffed and was being led to the booking room, he turned and spit a mixture of blood and saliva onto Parrott's face. Parrott testified he also suffered an abrasion on his forehead as a result of the altercation. He also testified that all three officers, as well as Chambers, were able to walk away from the altercation.

Burdett testified that as the booking process wore on, Chambers had become more uncooperative to the point of becoming hostile and a little violent; he told Chambers to calm down and not do anything stupid; and Chambers told him that he was fine. However, Burdett testified that as Parrott was taking Chambers out of the booking room, Chambers threw his belongings down and "went after" Parrott and tried to hit him. According to Burdett, he assisted Parrott in getting Chambers to the ground, but Chambers did not stop fighting them. He stated that Officer Jones assisted in getting Chambers handcuffed, and the dispatcher, Linda Raines, brought leg shackles; it was after Chambers had been shackled that he spit on Parrott and was placed in a restraint chair. Burdett testified his back was sore from the "scuffle," but he was able to walk away from the altercation and did not go to the hospital to be examined.

2

Officer Jones testified he was working as a part-time deputy for the sheriff's department and was at the jail working on an accident report at the time of the altercation with Chambers. According to Jones, when he assisted with subduing Chambers, Chambers punched him in the mouth, causing a laceration to his lip; Jones also suffered a broken finger as a result of the incident. Jones testified that he and Parrott went to the hospital to be examined, and Chambers was also taken to the hospital to be treated for a broken toe.

Jason Watson, the Clark County Sheriff, testified that the jailers have a wide range of duties, including booking inmates, controlling the jail, coordinating court appearances, setting up and monitoring visitation, and intaking property for inmates. The jailers were also responsible for continuously monitoring the inmates and ensuring their safety. Sheriff Watson testified that on April 20, 2018, Parrott and Burdett were the only two deputies actively monitoring the jail. Sheriff Watson also testified that Linda Raines had to leave dispatch to retrieve leg shackles for the deputies to use on Chambers, and while she was performing this task, no one was monitoring the video feeds or the jail. He said this concerned him greatly because they were responsible for the inmates' needs when they were in the custody of the detention center, and at that point, no one was paying attention to what was occurring at the jail. Sheriff Watson testified that he always needs to have at least two jailers on duty at all times, and he could use more.

After the State rested, Chambers moved for directed verdicts on the offenses of battery in the second degree and impairing the operation of a vital public facility. With regard to the charge of battery in the second degree, he argued that no one testified that

3

Parrott suffered any injuries. Chambers also argued that the offense of impairing the operation of a vital public facility required proof that the correctional officer was incapacitated, and no one was incapacitated during the incident. These motions were denied.

Chambers testified in his own defense. He claimed that the "squat and cough" procedure was sexual harassment, and Parrott "just completely crossed the line repeatedly." Chambers also claimed he was given a jumpsuit four or five sizes too small, and Parrott put his hands on him trying to "act tough." Chambers admitted he took the first swing but claimed he was provoked, and he classified the incident as "fisticuffs" in which none of the officers lost consciousness.

Chambers recalled Parrott to the stand. Parrott testified that he was not incapacitated at any time during the fight and neither were any of the other officers. However, Parrott testified on cross-examination by the State that during the altercation, no one was monitoring the videos or other inmates because of the situation with Chambers. Parrott stated that because of the altercation with Chambers, the two jailers were unable to carry out their duties.

The defense rested and again moved for directed verdicts on battery in the second degree and impairing the operation of a vital public facility, specifically pointing out Parrott's testimony that he had not been incapacitated by the altercation. These motions were again denied.

The State recalled Sheriff Watson as a rebuttal witness to introduce the video of the altercation that was captured by the jail monitors. After the State rested, Chambers again moved for directed verdicts, and they were again denied.

II. *Sufficiency of the Evidence - Battery in the Second Degree and Impairing the Operation of a Vital Public Facility*

In his first two points on appeal, Chambers argues that the circuit court erred in denying his motions for directed verdict on the charges of battery in the second degree against Steven Parrott and impairing the operation of a vital public facility.

A motion for directed verdict at a jury trial is considered a challenge to the sufficiency of the evidence. *Marbley v. State*, 2019 Ark. App. 583, 590 S.W.3d 793. In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Barfield v. State*, 2019 Ark. App. 501, 588 S.W.3d 412. We will affirm a circuit court's denial of the directed-verdict motion if there is substantial evidence, either direct or circumstantial, to support the verdict. *Marbley*, *supra*. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation and conjecture. *Barfield*, *supra*. We do not weigh the evidence presented at trial or assess witness credibility. *Turner v. State*, 2018 Ark. App. 5, 538 S.W.3d 227. It is the jury's role as the finder of fact to resolve questions of inconsistent evidence and conflicting testimony, and the jury is free to believe the State's version of the facts over the defendant's account. *Robinson v. State*, 2017 Ark. App. 689, 537 S.W.3d 765. The jury is not required to abandon common sense, and it may draw reasonable inferences from the evidence. *Id*.

5

In his motion for directed verdict for second-degree battery against Steven Parrott, Chambers argued no testimony was presented that any injuries were sustained. A person commits battery in the second degree if "the person knowingly, without legal justification, causes physical injury to or incapacitates a person he or she knows to be a law enforcement officer . . . or employee of a correctional facility while the law enforcement officer . . . or employee of a correctional facility is acting in the line of duty." Ark. Code Ann. § 5-13-202(a)(4)(A)(i) (Supp. 2019). "Physical injury" is defined as "impairment of physical condition; infliction of substantial pain; or infliction of bruising, swelling, or a visible mark associated with physical trauma[.]" Ark. Code Ann. § 5-1-102(14) (Repl. 2013). To determine if a physical injury exists, a jury may rely on its common knowledge, experiences, and observations in life to make that determination. *Linn v. State*, 84 Ark. App. 141, 133 S.W.3d 407 (2003). Furthermore, a jury may consider the severity of the attack and the sensitivity of the area of the body to which the injury was inflicted. *Id.* There is no requirement that a victim of second-degree battery seek medical treatment in order to be deemed to have sustained a physical injury. *M.T. v. State*, 2009 Ark. App. 761, 350 S.W.3d 792.

Chambers is incorrect in his assertion that there was no testimony Parrott suffered a physical injury. Parrott testified he suffered an abrasion on his forehead during the altercation with Chambers. Scratches and abrasions are sufficient to meet the definition of physical injury. *See Conner v. State*, 75 Ark. App. 418, 58 S.W.3d 865 (2001). The jury was entitled to give credit to Parrott's testimony.

6

Chambers also contends the circuit court erred in denying his motion for directed verdict on the charge of impairing the operation of a vital public facility. A person commits the offense of impairing the operation of a vital public facility "if, having no reasonable ground to believe he or she has a right to do so, the person knowingly causes a substantial interruption or impairment of an operation of a vital public facility by incapacitating an operator of a vital public facility[.]" Ark. Code Ann. § 5-38-205(a)(2) (Repl. 2013). A vital public facility includes "a county jail, city jail, public detention facility, or temporary holding facility for detained persons." Ark. Code Ann. § 5-38-205(c).

Chambers argued in his directed-verdict motion that he could not be convicted of impairing the operation of a vital public facility because no one was incapacitated in the altercation. On appeal, Chambers continues to make this argument, but he also additionally argues that there was no evidence that the operations of the jail were substantially interrupted or impaired during the altercation. This court may address only the argument Chambers made in his directed-verdict motion—that no one was incapacitated during the altercation. *Davis v. State*, 365 Ark. 634, 232 S.W.3d 476 (2006) (directed-verdict motion must address specific element of crime challenged in order to preserve argument for review).

The criminal code does not define "incapacitate," but its common meaning is "to remove someone's ability to do something." Incapacitated, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/incapacitate (last visited Jan. 22,

7

2020).  In matters of statutory interpretation, courts give words their ordinary and usually accepted meaning.  *Holcomb v. State*, 2014 Ark. 141, 432 S.W.3d 600.

Chambers argues that because Parrott testified no jailer was physically incapacitated, the circuit court erred in denying his motion for directed verdict on impairing the operation of a vital public facility.  We disagree.  Chambers admitted that he took the first swing at Parrott, which led to the only two jailers on duty (Parrott and Burdett), an officer who happened to be at the jail working on an accident report (Jones), and the dispatcher (Raines) to focus all attention on Chambers.  During that period of time, the deputies (as well as the part-time officer and the dispatcher) were unable to monitor the jail and perform their duties.  Furthermore, while Parrott was at the hospital being examined after the altercation, he was unable to perform his duties as a jailer.

### III.  *Denial of Chambers's Request to Proceed Pro Se*

Chambers's last point on appeal is that the circuit court erred in denying him his constitutional right to defend himself at trial.  At his April 5, 2019 pretrial hearing, Chambers's public defender informed the circuit court that Chambers had fired him and wanted a different public defender because Chambers had lost confidence in him.  The circuit court explained to Chambers that he was not able to choose his public defender. Chambers said he did not want the public defender appointed to him.  The circuit court asked Chambers if he wanted to hire his own attorney, and Chambers informed the circuit court he could not afford to do that.  Chambers said that he "guessed" he would have to do it himself if he had to.  The circuit court asked Chambers if he had ever represented himself before; he said no.  The circuit court then asked if Chambers had attended law

school or college; Chambers answered no to those questions as well. When the circuit court asked Chambers if he had any idea what the rules of evidence entailed, Chambers answered, "Very little, sir. No, sir." The circuit court then stated that it did not sound like Chambers had the ability to represent himself and asked what made Chambers think he could do so. Chambers replied, "Well, I don't think I can, but I know [the public defender] won't." The circuit court told Chambers that it did not believe he had met the standard to represent himself and it did not even believe Chambers had indicated he wanted to represent himself. The circuit court gave Chambers two choices—go forward with the public defender or hire his own attorney. Chambers asked, "I can't go pro se? I can't just do this by myself?" The circuit court again stated not only did it not think Chambers had indicated he believed he could represent himself, ultimately, he did not want to represent himself. Chambers replied, "I don't. I don't feel like I have any other option, though."

In pretrial proceedings the day of trial, the circuit court asked Chambers, "And you did tell me last Friday that you didn't believe you had the ability or could represent yourself. Is that correct?" Chambers replied, "Yes, sir."

A criminal defendant has a constitutional right to counsel. *Collins v. State*, 338 Ark. 1, 991 S.W.2d 541 (1999). However, that right is a personal right that may be waived at the pretrial stage or at trial. *Id*. A criminal defendant may proceed pro se when (1) the request to waive the right to counsel is unequivocal and timely asserted; (2) there has been a knowing and intelligent waiver of the right to counsel; and (3) the defendant has not engaged in conduct that would prevent the fair and orderly exposition of the issues. *Id*.

9

Every reasonable presumption must be indulged against the waiver of fundamental constitutional rights. *Id.*

In support of his argument, Chambers asserts that his request to represent himself was unequivocal, and he cites *Johnson v. State*, 2015 Ark. App. 677, 476 S.W.3d 807, for the proposition that the circuit court erred in finding that his waiver was not knowingly and intelligently made. The circuit court must establish on the record that the defendant is making a knowing and intelligent waiver of the defendant's right to counsel; this is done by engaging in a dialogue with the defendant that is sufficient to show the defendant is aware of his right to counsel and the danger in representing himself. *Talley v. State*, 2017 Ark. App. 550, 533 S.W.3d 95. The circuit court must question the defendant to make certain that the defendant knows he is entitled to an attorney and may have an attorney represent him at trial even if he cannot afford an attorney and that he understands the advantages of being represented during trial by an attorney and the drawbacks of not being represented at trial by an attorney. *Id.* A defendant's lack of technical legal knowledge is not relevant to a determination of whether he had made a knowing and intelligent waiver of his right to counsel. *Id.*; *see also Whitlow v. State*, 2016 Ark. App. 510, 506 S.W.3d 272.

We agree that the circuit court's questioning Chambers about whether he had attended college or law school was not relevant to whether Chambers knowingly and intelligently waived his constitutional right to counsel at trial. However, we affirm the circuit court's denial of Chambers's request to represent himself at trial because he did not unequivocally request to represent himself.

10

A defendant's statements must be viewed in their entirety to determine whether the defendant's attempt to waive counsel and self-represent is sufficiently unequivocal. *Reed v. State*, 2017 Ark. 246, 524 S.W.3d 929. Here, while Chambers requested to represent himself because he did not want his court-appointed defender and could not afford to hire a private attorney, he stated that he would represent himself "if [he had] to." After the circuit court asked Chambers about his education and why he thought he could represent himself, Chambers stated that he did not think he could. The circuit court reiterated on two more occasions that it did not believe Chambers had really indicated he wanted to represent himself; after the circuit court's second statement to that effect, Chambers responded that he did not want to represent himself, but he did not feel he had any other option. These statements indicate that Chambers's requests to proceed pro se were not unequivocal; therefore, the circuit court correctly denied Chambers's request to represent himself at trial.

Affirmed.

VIRDEN and BROWN, JJ., agree.

*Joseph C. Self*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.